693 A.2d 815

## AMERICAN TELEPHONE AND TELEGRAPH COMPANY et al.

v.

## STATE DEPARTMENT OF ASSESSMENTS AND TAXATION.

No. 37, Sept.Term, 1996.

Court of Appeals of Maryland.

May 9, 1997.

Charles C. Shelton (Evan J. Feldman, Basik, Bushel & Shelton), Columbia; H. Thomas Howell (Howell, Gately, Whitney & Carter, LLP, Towson, on brief), for Petitioners.

William K. Hammond, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General; David M. Lyon, Assistant Attorney General, on brief), Baltimore, for Respondent.

James R. Eads, Jr., Michael J. Guerriero, Senior Attorneys, AT&T, Basking Ridge, NJ, of counsel, on appellant's brief.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

RODOWSKY, Judge.

This case involves the property tax on the operating property of public utilities. The appellants, American Telephone and Telegraph Company (AT&T) and AT&T Communications of Maryland, Inc. (ATTCOM), contend that, as a result of the advent of competition in long distance telephone service, they are no longer public utilities within the meaning of the tax statute so that their operating property should be assessed as that of an ordinary business corporation. As explained below, we do not accept the appellants' contention.

In the field of property taxation it has long been recognized that the property of certain entities that utilize all or most of their property as an integrated whole in their business operations is best valued by valuing the entire operating unit. This unit value method may be contrasted with a system under which segments of the operating whole that lie within a particular taxing jurisdiction would be assessed by that partic-

ular jurisdiction. Valuing operating property on the operating unit basis permits the use of the income approach to value. Where the operating unit of the taxpayer encompasses more than one state, it is necessary for the taxing authority of a particular state first to allocate to that state its appropriate share of the value of the whole and then, within that state, to apportion the share of the unit value allocated to that state among the local taxing jurisdictions in which lie segments of the taxpayer's operating system.

The unit method of valuation seems first to have been applied by the states to the railroads, and that application of the assessment method was held to be compatible with the Interstate Commerce Clause in *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co. v. Backus*, 154 U.S. 439, 14 S.Ct. 1122, 38 L.Ed. 1041 (1894). There the Court said:

> "The true value of a line of railroad is something more than an aggregation of the values of separate parts of it, operated separately. It is the aggregate of those values plus that arising from a connected operation of the whole, and each part of the road contributes not merely the value arising from its independent operation, but its mileage proportion of that flowing from a continuous and connected operation of the whole. This is no denial of the mathematical proposition that the whole is equal to the sum of all its parts, because there is a value created by and resulting from the combined operation of all its parts as one continuous line. This is something which does not exist, and cannot exist, until the combination is formed."

*Id.* at 444, 14 S.Ct. at 1123, 38 L.Ed. at 1045.

Presenting the same concept from the standpoint of an attempt to value railroad property by some other method, the Court further said:

> "The amount and profitable character of such use determines the value, and if property is taxed at its actual cash value it is taxed upon something which is created by the uses to which it is put. In the nature of things it is practically impossible—at least in respect to railroad prop-

erty—to divide its value, and determine how much is caused by one use to which it is put and how much by another. Take the case before us; it is impossible to disintegrate the value of that portion of the road within Indiana and determine how much of that value springs from its use in doing interstate business, and how much from its use in doing business wholly within the state. An attempt to do so would be entering upon a mere field of uncertainty and speculation. And because of this fact it is something which an assessing board is not required to attempt."

*Id.* at 445–46, 14 S.Ct. at 1124, 38 L.Ed. at 1046.

Maryland, by Chapter 488 of the Acts of 1943, adopted the operating unit method of assessment for "[o]perating property, except land, of railroads, other public utilities and contract carriers...." Md.Code (1939, 1947 Cum.Supp.), Art. 81, § 13. As part of the Code Revision Project, the legislative directive for valuing the operating unit of a public utility was codified as a separate section. *See* Md.Code (1986), § 8–108 of the Tax–Property Article (TP (1986)), as enacted by the Acts of 1985, ch. 8. The case now before us involves the appellants' operating property assessment made by the State Department of Assessments and Taxation (the Department) for the tax year beginning July 1, 1991. For that tax year the property was valued as of the date of finality of January 1, 1991. Prior to January 1, 1991, TP (1986) § 8–108 was amended and renumbered. Consequently, the provisions of the public utility operating unit valuation directive that apply to the tax year before us are found in Md.Code (1986, 1990 Cum.Supp.), § 8–109 of the Tax–Property Article (TP (1990)). They read:

"(a) *Valuation of public utility operating property.*—The Department shall value the operating unit of a public utility on the basis of the value of the operating property of the public utility, by considering:

"(1) the earning capacity of the operating unit; and

"(2) all other factors relevant to a determination of value of the operating unit.

"(b) *Allocation of property to the State.*—The Department shall allocate to this State the value of that part of the operating unit that is reasonably attributable to the part located in this State.

"(c) *Assessment.*—(1) From the value allocated to this State under subsection (b) of this section, the Department shall deduct:

"(i) the assessment of operating land[.]

. . . .

"(2) The value remaining after making the deductions is the assessment of the operating property of a public utility.

"(3) Operating land of a public utility is valued and assessed as the land adjacent to the public utility's land is valued and assessed."

Subsection (d) of the statute addresses apportionment to the counties and municipal corporations of the value allocated to Maryland.

"Public utility" as used in the property tax statute is not a defined term. The appellants seek to drive the wedge of their argument into that statutory crack.[1]

---

1. "Operating property" and "operating unit" are statutorily defined terms in the Tax–Property Article. TP (1986) § 1–101(u) and (v) provided:

"(u) *Operating property.*—(1) 'Operating property' means any property used to operate a railroad or public utility.

"(2) 'Operating property' includes land that is used directly to operate a railroad or public utility.

"(v) *Operating unit.*—(1) 'Operating unit' means, as determined by the Department, all of the operating property of a railroad or a public utility.

"(2) 'Operating unit' includes operating property that is located outside of the State.

"(3) 'Operating unit' does not include more than 1 railroad or public utility for which separate accounts are kept, unless the Department finds that:

"(i) the accounts are under the same or commonly controlled management; and

"(ii) the inclusion is necessary to determine the value of the operating property."

From 1943 to date the operating property of AT&T and its operating subsidiaries in Maryland has been assessed on the operating unit basis. In January 1956 a consent final judgment was entered in the historic Bell System divestiture action brought by the United States of America. *United States v. Western Electric Co.*, 1956 Trade Cas. (CCH) ¶ 68,-246 (D.N.J.1956). By a modification of final judgment entered August 24, 1982, (the MFJ), each Bell System operating company, "[a]s part of its obligation to provide non-discriminatory access to interexchange carriers, no later than September 1, 1984," was required to "begin to offer to all interexchange carriers exchange access on an unbundled, tariffed basis, that is equal in type and quality to that provided for the interexchange telecommunications services of AT&T and its affiliates." *United States v. Western Elec. Co.*, 1982–83 Trade Cas. (CCH) ¶ 65,130 (D.D.C.1982).

By an order of September 11, 1984, the Public Service Commission of Maryland (PSC) granted the application of MCI Telecommunications Corporation to provide intrastate intercity telecommunications services in Maryland and authorized MCI's rates and tariffs as "presumptively" reasonable. *In re MCI Telecommunications Corp.*, 75 Md.P.S.C. 331 (1984). On November 19, 1984, the PSC granted authority to ATTCOM to provide interexchange services in Maryland under a flexible rate schedule. *In re AT&T Communications of Maryland, Inc.*, 75 Md.P.S.C. 495 (1984), *aff'd sub nom. Maryland People's Counsel v. Heintz*, 69 Md.App. 74, 516 A.2d 599 (1986), *cert. denied*, 309 Md. 48, 522 A.2d 393 (1987). Subsequently, GTE Sprint Communications Corp. entered the Maryland interexchange telephone service market. *In re GTE Sprint Communications Corp.*, 77 Md.P.S.C. 437 (1986).

The Department assessed the appellants' operating property at $209,120,520 for the tax year beginning July 1, 1991. The Department first valued all of the appellants' operating property, consisting of land, aerial cable, underground cable, buried cable, submarine cable, underground conduit, central office equipment, furniture and office equipment, other work equipment, material and supplies, buildings, large private

branch exchanges, other communications equipment, public telephone equipment, and poles. The value of all of the operating property was $212,941,000. From this the Department deducted $3,820,480, representing the value of the land that had been locally assessed. This produced the $209,120,-520 assessment of the operating property. That assessment was further broken down on the face of the final notice of assessment as $74,133,510 in "Improvements to Property" and $134,987,010 in "Personal Property."

The appellants appealed the Department's final assessment to the Maryland Tax Court. There the appellants contended, *inter alia*, that they were no longer a "public utility" within the meaning of TP (1990) § 8–109. If the appellants were no longer public utilities, their property would be assessed as the property of ordinary business corporations. As ordinary business corporations, the "Improvements to Property" would have been assessed as real property at "40% of its phased in value." TP (1990) § 8–103(c)(1). Under the unit valuation method, however, the improvements valued at $74,133,510 were treated as personal property, and assessed at 100% of value on the date of finality. *See* TP (1990) § 8–107(a).

The appellants' argument to the Tax Court, and to us, is that the plain meaning of "public utility" includes "natural monopoly" as an essential element. Drawing on the testimony before the Tax Court of their economics expert, appellants submit that "[t]he main attribute of a natural monopoly is an industry in which competition is neither efficient nor desirable because total industry output can be produced by a single firm at the lowest possible cost." Brief for Appellants at 16. The appellants also refer to the dictionary definition of "public utility" as "a business organization deemed by law to be vested with public interest usu. because of monopoly privileges....," *Webster's Third New International Dictionary of the English Language Unabridged* at 1836 (1993), and to *Black's Law Dictionary* at 1232 (6th ed. 1990), which concludes its definition of "public utility" by stating, "It is always a virtual monopoly." Appellants also emphasize the opinion by the Tax Court which, in part, stated:

"In the instant case, the strength of Petitioners' position is the seemingly unambiguous phrase 'public utility' as found in § 8–109. Under the plain-meaning rule, this Court would be hard-pressed to dispute the Petitioners' claim that a public utility must be a natural monopoly and that the long distance industry, since divestiture, has undergone such a substantial transformation in character from a natural monopoly to a competitive business to remove it from the jurisdiction of the taxing statute."

The Tax Court, however, citing *Kaczorowski v. City of Baltimore,* 309 Md. 505, 525 A.2d 628 (1987), concluded that sole reliance on the plain-meaning rule would be contrary to the legislative purpose or goal. After considering the original purpose of the statute, its subsequent legislative history, and the consistent administrative practice of the Department, the Tax Court concluded that the appellants were public utilities under § 8–109.

The appellants sought judicial review of the agency ruling by the Circuit Court for Baltimore County. That court affirmed, substantially for the reasons assigned by the Tax Court. The appellants appealed to the Court of Special Appeals and then petitioned this Court for the writ of certiorari. We granted the writ prior to consideration of the matter by the Court of Special Appeals.

In our review we shall consider (I) the plain-meaning argument, (II) the natural monopoly contention in the context of the 1943 enactment of § 8–109, (III) the legislative purpose in the original enactment and in subsequent amendments, and (IV) the administrative practice.

I

The construction of a statute is a question of law, and, as between agency and court, the question is ultimately determined by a court. *Comptroller of the Treasury v. Disclosure, Inc.,* 340 Md. 675, 682, 667 A.2d 910, 913–14 (1995); *State Dep't of Assessments & Taxation v. Consumer Programs, Inc.,* 331 Md. 68, 71–72, 626 A.2d 360, 362–63 (1993);

*Supervisor of Assessments v. Chase Assocs.*, 306 Md. 568, 574, 510 A.2d 568, 571 (1986). If an agency permits a witness to testify concerning the meaning of a statute, and even if the agency agrees with the conclusion of the witness, that process does not convert the agency's statutory construction into a factual determination by the agency to which a court must defer.

Stripped of any reference to time or other circumstances, the term "public utility" does not have a plain meaning that includes as an essential element the enjoyment of a natural monopoly. For example, an article by G. Robinson, *The Public Utility Concept in American Law*, 41 Harv.L.Rev. 277 (1928), was written in the period after *Munn v. Illinois*, 94 U.S. 113, 24 L.Ed. 77 (1876), but before *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934). The author uses "public utility" in his article's title in the *Munn v. Illinois* sense of a business vested with a public interest that is subject to economic regulation by the state. Hardman, *Public Utilities: I. The Quest for a Concept*, 37 W.Va.L.Q. 250, 260 (1931), wrote (as quoted in J. Geffs, *Statutory Definitions of Public Utilities and Carriers*, 12 Notre Dame Law. 246, 247 (1937)):

" 'So far then it would seem that if in this realist world the lawyers, like most others, are willing to look at the "facts," it must be conceded that there is no universal rule, no "solving" concept, no purely legalistic approach that will determine in all cases what fact situations constitute a public utility....' "

On the other hand, a 1931 work setting forth the characteristics of public utilities states flatly that "[p]ublic utilities are natural monopolies." E. Jones & T. Bigham, *Principles of Public Utilities*, at 67 (1931). Two years later the Supreme Court of Missouri in *State v. Public Service Comm'n*, 333 Mo. 426, 62 S.W.2d 742, 746 (1933), said:

" 'Even though two power corporations may operate on the same schedule of rates, they may compete with each other in such matters as the character of service they render, the courtesy and efficiency of their employees in doing it, the

modernization of their equipment and the economy of their operation, all of which are matters of some importance to the consumers. We have not reached the place where such improvements in equipment and methods of operation and service cannot be further perfected. Self-interest in obtaining business and making profits is still, and apparently will continue to be, the greatest incentive in bringing about such advancements.' "

We turn then to "public utility" in the context of TP § 8–109.

## II

The source of TP (1990) § 8–109, Chapter 488 of the Acts of 1943, resulted from the January 28, 1941 Report of the Maryland Tax Revision Commission of 1939 (the Report). As encapsulated in its summary, the Report made the following recommendation, *inter alia*, in the area of corporation taxation:

"1. That all operating property, except land, of railroads and utilities, domestic and foreign, be centrally assessed by the State Department and that all their operating property, including land, be made subject to direct State and local property taxes. This will involve the extension of the State property tax to railroads and the repeal of the share tax on domestic utilities."

Report at *ix-x*. The Report defined "utility" to mean "a public service corporation other than a railroad." Report at 52.

Chapter 488 of the Acts of 1943 did not track precisely the language of the Report. The term, "utility," defined in the Report, was changed to "other public utilities" in the statute, and the operating property of "contract carriers" was added by the statute. These provisions were codified as Md.Code (1947 Cum.Supp.), Art. 81, §§ 6(5) and 13. Section 6 provided:

"The following property ... shall be subject to assessment to the owner and taxation for ordinary taxes [*i.e.*,

property taxes] in this State and in the county and/or city specified below:

. . . .

"(5) All operating property located in this State of railroads, other public utilities and contract carriers (except motor vehicles and other mobile operating property not permanently located in this State of common and contract carriers by motor vehicle who are not residents of this State), in the counties and/or cities to which the value thereof is apportioned under Section 13."

Article 81, § 13 of Md.Code (1947 Cum.Supp.) read: "Operating property, except land, of railroads, other public utilities and contract carriers shall be valued and assessed as follows[.]" Thereafter the statute set forth very detailed procedures for an operating unit valuation, allocation, and apportionment.

Under the 1943 enactment, operating units of "railroads, other public utilities and contract carriers," would not be assessed in the same way as property of ordinary business corporations. At the time of the 1943 enactment Article 81 contained a definition of an "ordinary business corporation." It was

"any corporation having a capital stock, except corporations of the following classes, but only if such corporations are doing business in this State; *railroad and other public service corporations operating railroad or other public service properties, lines or works in this State (other than properties, lines or works for transportation by air or transmission by radio)*, oil pipe-line corporations operating oil pipe-lines in this State, safe deposit and trust companies, building or homestead associations, state, national and savings banks, and savings and finance corporations."

Md.Code (1939), Art. 81, § 2(8) (emphasis added). Thus, it seems likely that in 1943 the "other public utilities" of then Art. 81, §§ 6 and 13 were the "other public service corporations" of § 2(8).

In 1943 the PSC statute, Md.Code (1939), Art. 23, §§ 344 through 429, applied to the "public service corporations and persons [t]herein mentioned and referred to." § 344. A public service corporation, other than a railroad, was a street railroad corporation, a common carrier, a gas corporation, an electrical corporation, a telephone company, a telegraph company, a water company, or a heat or refrigerating company. *Id.* Of course, inasmuch as the 1943 tax statute contained detailed provisions for allocating to Maryland its portion of the value of the operating units of interstate businesses, "other public utilities" in Article 81 were not limited to public service corporations regulated exclusively by the PSC.

Under the 1943 enactment, Art. 81, § 6(5) also parenthetically excepted certain mobile property from operating property. Stating that exception affirmatively, the operating unit method of assessment was to include "motor vehicles and other mobile operating property . . . permanently located in this State of common and contract carriers by motor vehicle who are not residents of this State." Including contract carriers and common carriers in the 1943 tax statute is inconsistent with the notion that the General Assembly intended only natural monopolies to be assessed as operating units.[2] A line of decisions of this Court makes plain that competition between common carriers, between contract carriers, or be-

---

**2.** Illustration of the concept, "contract carrier," may be taken from the freight transport market. In 1943 the PSC had certain jurisdiction over "Public Freight Motor Vehicles" under Md.Code (1939), Art. 56, "Licenses," §§ 311 through 323, even if the freight transporter were not a common carrier. "[E]ach owner of a motor vehicle to be used in the intrastate public transportation of merchandise or freight" was required to secure a permit from the PSC to operate over Maryland roads. § 311. Further, motor vehicles "operating intrastate for hire . . . on regular schedules or between fixed termini, including those used by corporations, groups of individuals and associations, engaged in the transportation of freight or merchandise of their stockholders, shareholders or members, whether on the co-operative plan or otherwise," were subject to the Public Freight Motor Vehicles Act and to the permit requirements of § 311. Former Art. 56, § 312. Under § 312, the "public duties of a common carrier" were "not . . . imposed on the owner of any such vehicle not actually engaged in public transportation." *Id.*

tween a common carrier and a contract carrier was permitted under the PSC law.

By Chapter 456 of the Acts of 1931 the General Assembly had amended the corporation statutes to permit a cooperative "to transport the products of its members, even though in so doing it may compete with licensed common carriers." In 1933 this Court construed the amendment to mean that a license from the PSC under the Public Freight Motor Vehicles subtitle of Article 56 would first be required in order for the cooperative to compete. *Parlett Co–operative, Inc. v. Tide-water Lines, Inc.,* 164 Md. 405, 165 A. 313 (1933). Because the competing cooperative in that case had not obtained a permit from the PSC, an injunction restraining the coopera-tive was affirmed. *Id.* at 421, 165 A. at 319. *See also Madonna & Shawsville Co–operative Co. v. Public Serv. Comm'n,* 168 Md. 95, 176 A. 611 (1935) (same).

In *Public Serv. Comm'n v. Williams,* 167 Md. 316, 173 A. 259 (1934), the PSC had granted permission to a bus company to transport passengers from points on the Eastern Shore of Maryland to Annapolis, via ferry, and over land to Baltimore. The electric railway company that had been serving the Baltimore–Annapolis corridor for twenty-five years obtained an injunction which this Court reversed. We said that "[t]he existing steam or electric lines do not have a franchise which is exclusive of the later form of transportation by motor vehicles, but the perplexing policy of regulation is for the State or its duly constituted agency and not for the courts." *Id.* at 329, 173 A. at 264.

Five contract carriers who were transporting Coca–Cola products from Baltimore to Cumberland and from Baltimore to Salisbury by specified routes unsuccessfully sought to over-turn a PSC permit for a sixth contract carrier to serve the same market in *Tidewater Express Lines, Inc. v. Public Serv. Comm'n,* 199 Md. 533, 87 A.2d 158 (1952). This Court said:

> "If we assume that under [the Public Freight Motor Vehicles subtitle] it is the duty of the Commission, in exercising the power to grant or refuse permits, to prevent

destructive competition, this duty is at most one of 'imperfect obligation', not defined in the statute, but dependent upon the Commission's finding of facts as to the 'public welfare and convenience'...."

*Id.* at 540, 87 A.2d at 161.

For other decisions to the same effect, see *Maryland Transp. Co. v. Public Serv. Comm'n*, 253 Md. 618, 628, 253 A.2d 896, 902 (1969) ("'[T]here is nothing in the statutes requiring either monopoly or competition between carriers.'" (quoting the adopted circuit court opinion)); *Clark v. Public Serv. Comm'n*, 209 Md. 121, 132–33, 120 A.2d 363, 369 (1956) ("[T]he obligation of the [PSC] to protect a common carrier against competition in order to conserve existing investments is secondary to the paramount obligation of the Commission to secure adequate and permanent service for the public at the least possible cost.").

When the General Assembly enacted the operating property tax statute in 1943, the railroads and electric railways were facing growing competition from motor freight carriers and buses. Nevertheless, the General Assembly directed that railroads, contract carriers, certain common carriers, and other public utilities, including telephone companies, all be assessed in the same fashion. Although AT&T may have been a natural monopoly in 1943, the statute does not support a construction under which continuing natural monopoly status was intended to be a *sine qua non* for the tax authorities to continue making operating unit valuations.

### III

The legislative history also reflects that the principal purpose of the 1943 legislation was appropriately to value operating units—not to tax by a special method only those public utilities that currently enjoyed natural monopolies under their franchises. Indeed, the Report recognized that the entities whose operating units were to be valued did, indeed, face competition.

"Operating property of railroads and utilities, domestic and foreign, should be valued on the unit basis according to its earning capacity, using net operating income as a guide (*Cleveland, Cincinnati, Chicago & St. Louis Ry. Co. v. Backus,* 154 U.S. 439[, 14 S.Ct. 1122, 38 L.Ed. 1041].) In the case of a property lying partly in another State or other States a proper share of the unit valuation would be allocated to Maryland. The properties would thus be valued as going concerns and the valuations would include intangible values, but in the case of railroads and utilities, *competition or regulation, or both,* make intangible values small, and in some cases non-existent. The assessments of operating property other than land would be arrived at by deducting from the valuations thus made the locally made assessments of operating land."

Report at 63–64 (emphasis added).

Integral to operating unit valuation was the Report's proposal for central assessing. It was pointed out that local assessments of operating property then ranged from below 20% to more than 200% of the value of the property. Report at 61. "The result [was] that operating property of railroads, other than rolling stock, and operating property of foreign utilities [was] assessed at a lower percentage of value on the whole than the property of domestic utilities." *Id.*

This emphasis on the appropriate assessment of the operating unit of a utility was reaffirmed by the legislative response to *Sears, Roebuck & Co. v. State Tax Comm'n,* 214 Md. 550, 136 A.2d 567 (1957). *Sears* held that the taxing authorities had denied equal protection to commercial enterprises by valuing their stock in business at 100% of value when real property was assessed at from 25% to 60% of value. Implicit in the *Sears* decision was that Md.Code (1951), Art. 81, § 7, listing "What Shall Be Taxed And Where," including real property, operating property, and stock in business, did not create separate classifications for tax purposes. The General Assembly thereupon enacted Chapter 73 of the Acts of 1958 which was expressly retroactive to January 1, 1957. The

constitutionality of Chapter 73 was sustained in *National Can Corp. v. State Tax Comm'n,* 220 Md. 418, 153 A.2d 287 (1959).

Chapter 73, *inter alia,* in a new statutory section (§ 14) separately classified real and personal property and subclassified personal property for assessment purposes into stock in business, distilled spirits, and "[a]ll other personal property directed in [Art. 81] to be assessed." Md.Code (1965), Art. 81, § 14(a). The 1958 legislation also provided:

"All operating property of railroads, public utilities, and contract carriers ... shall be assessed in accordance with the provisions of [the section providing the detailed description of operating unit valuation]. To the extent that the personal property of the classes of taxpayers mentioned in this subsection is subject to taxation by this article, said personal property shall be assessed in accordance with the provisions of paragraph (2) hereof [*i.e.,* at full cash value on date of finality]."

Md.Code (1965), Art. 81, § 14(b)(3).

Years after the initial final judgment of 1956 in the Bell System divestiture litigation, the Code Revision Commission undertook the revision of then Article 81. After the MFJ of August 24, 1982, and after September 1, 1984, the date by which the various Bell operating companies were required to offer all interexchange carriers exchange access, the General Assembly enacted the Tax–Property Article by Chapter 8 of the Acts of 1985. That enactment continued operating unit assessment of the operating property of railroads and public utilities. TP (1986) §§ 8–107 and 8–108. The then new Tax–Property Article, however, did not carry forward contract carriers as owners whose property would be assessed on the operating unit basis. The change is explained in the Revisor's Note following TP (1986) § 8–101. Subsection (c) of that section created subclasses of personal property, including "(3) operating property of a railroad" and "(4) operating property of a public utility." The Revisor's Note explains that, "[i]n subsection (c)(3) of this section, the former reference to 'contract carriers' is deleted as obsolete in light of current Depart-

mental practice." Thus, although it is apparent that the then current applications of the operating unit method of assessment had been reviewed during the revision project, the advent of competition in the long distance telephone market did not result in any change involving interexchange carriers comparable to that involving contract carriers.

The most recent changes to the statutes dealing with operating property of public utilities were made by Chapter 142 of the Acts of 1993, as a direct result of arguments made by the appellants in their challenge to the assessment of their operating improvements to realty at 100% of value for the tax year now before us. Those challenges were decided adversely to appellants by the Maryland Tax Court, but they are not renewed by the appellants in the instant appeal.

Essentially, Chapter 142 added the operating property of a railroad and of a public utility as subclasses of real property in TP (1986, 1994 Repl.Vol.) § 8–101(b)(7) and (8) and amended the subclasses of personal property in § 8–101(c)(3) and (4) to insert the word "personal" in the references to operating property of railroads and of public utilities. Chapter 142 further added a new § 8–103(c)(4), providing that "[t]he assessment of the operating real property described in § 8–109(c) of this title [*i.e.*, public utility operating real property] is its value." Section 2 of Chapter 143 also provides that the Act "shall take effect June 1, 1993 and be applicable to taxable years beginning on or after July 1, 1989." The 1993 enactment makes explicit that "the operating real property" of a public utility is not assessed at forty percent of value, as would be the real property of an ordinary business corporation.

By referring to the 1993 legislation, we do not rely on its retroactive application to the tax year now before us. The Tax Court held that the operating improvements in appellants' assessment were properly valued at full cash value under the tax statutes as they were in effect on January 1, 1991. The Tax Court did not rely on any retroactive legislating or ratifying by the General Assembly in the 1993 statute. Appellants have not challenged that Tax Court determination here.

Thus, of significance to the issue before us is the reaffirmation in the 1993 legislation of the operating unit method of assessment for public utilities years after there had been regulated competition in the long distance telephone market.

The appellants make no argument that, from the standpoint of determining value, the operating unit method of assessment in some way loses its effectiveness as a valuation tool for one owner because other owners of similar operating property are engaged in the same type of business. The purpose of the 1943 enactment was to value railroads, other public utilities, and contract carriers by the operating unit method. We have seen that natural monopoly status was not, and was not expected to be, a uniform characteristic of the owners whose property was selected for that method of valuation. Further, because the operating unit method of valuation makes the income approach to value available for these property tax assessments, any adverse effects of competition on a utility's value should be reflected in the assessment derived from considering income. Although, as an historical fact, the absence of unregulated competition was a substantial factor in the building of the present operating units of public utilities, the presence of regulated competition today does not make those existing operating units no longer assessable as an integrated whole. Interpreting TP (1990) § 8–109 with emphasis on the type of property to be valued, as opposed to emphasis on any former monopoly franchise status, is in keeping with the legislative goal. *Compare Polomski v. Baltimore,* 344 Md. 70, 75–76, 684 A.2d 1338, 1340–41 (1996) (construe statutes consistently with purpose); *C.S. v. Prince George's County Dep't of Social Servs.,* 343 Md. 14, 24, 680 A.2d 470, 475 (1996) (same); *State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339, 1340–41 (1996) (same); *Haupt v. State,* 340 Md. 462, 471, 667 A.2d 179, 183 (1995) (same); *Blaine v. Blaine,* 336 Md. 49, 64–65, 646 A.2d 413, 420–21 (1994) (same).

## IV

In the more than fifty years that have elapsed since the implementation in 1943 of the Report, the State Tax Commis-

sion and the Department, so far as the instant record reflects, have assessed the operating property of public utilities, including that of the appellants and other telephone companies, by valuing the operating unit. In Part III we have reviewed the most significant legislative actions taken concerning operating property of public utilities over the decades. The absence of any change by the legislature to those practices further evidences that the administrative interpretation and application of the statute has been, and is, correct. *See NCR Corp. v. Comptroller of the Treasury,* 313 Md. 118, 125, 544 A.2d 764, 767 (1988); *Baltimore Gas & Elec. Co. v. Public Serv. Comm'n,* 305 Md. 145, 161, 501 A.2d 1307, 1315 (1986); *Demory Bros., Inc. v. Board of Pub. Works,* 273 Md. 320, 325–27, 329 A.2d 674, 677–79 (1974).

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.