855 A.2d 1197

**STATE DEPARTMENT OF ASSESSMENTS
AND TAXATION, et al.**

v.

**CONSOLIDATION COAL SALES COMPANY.**

**No. 135, Sept. Term, 2003.**

Court of Appeals of Maryland.

Aug. 3, 2004.

440

Donald E. Rea (Kimberly S. Grimsley, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, Thurman W. Zollicoffer, Jr., City Solicitor, William R. Phelan, Jr., Principal Counsel), William K. Hammond, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellants/cross-appellees.

K. Donald Proctor (Margaret M. McKee, Proctor & McKee, P.A., Towson, on brief), for appellee/cross-appellant.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

In this case, we must determine whether Consolidated Coal Sales Company (hereinafter "CCSC") is entitled to a manufacturer's exemption from personal property taxation pursuant to Maryland Code, Section 7–225 of the Tax–Property Article (1985, 2001 Repl.Vol.), which excludes storage, shipping, and receiving facilities from receiving the exemption. After deciding that CCSC is a storage, shipping, and receiving facility and that CCSC's "blending" activities do not constitute "manufacturing" as it is defined by Section 1–101(r) of the Tax–Property Article, the Tax Court concluded that CCSC does not qualify for the exemption. We agree with the Tax Court and hold that CCSC is ineligible for the manufacturer's exemption.

## I. Introduction

### A. Facts

In light of the fact that the parties base their arguments on whether a procedure called "blending" constitutes "manufacturing" for the purposes of the manufacturing exemption, we shall review in detail the coal production and shipping process at issue in this case.

In the Port of Baltimore, CCSC, a subsidiary of Consol Energy, Inc. (hereinafter "Consol"), operates a terminal that receives, stores, and ships coal to domestic and international markets on behalf of coal producers, coal brokers, and utilities. The majority of the coal that CCSC receives is extracted from Consol's Bailey Mine Complex in southwestern Pennsylvania, which covers more than two hundred and seventy-five square miles and is the world's largest underground mining complex.

The coal extracted from the Bailey Mine Complex is processed by the Bailey Central Preparation Plant before it is sent to facilities such as CCSC or sold directly to customers. Processing consists of "sizing," "cleaning," and "blending" the raw coal. Sizing occurs when raw coal, which can consist of a mass as large as a basketball, is crushed to form roughly uniform two-inch squares. The cleaning process removes rock, wood, and other extraneous materials from the raw coal that generally comprise 25 percent of the raw coal or approximately 25 tons of material for every 100 tons of raw coal that is cleaned at the Bailey plant. After the coal is cleaned, it then is dried using mechanical processes described by its engineers as "gravity dewatering" and "thermal dewatering."

Once the coal is sized, cleaned, and dried, it undergoes a sophisticated "blending" process while still at the Bailey Central Preparation Plant. Because coal consists of different and measurable amounts of BTU, ash, and sulphur, blending is necessary in order to create a coal product containing specific amounts of those materials that meet customers' needs. CCSC describes blending as "the taking of large quantities of coals of different chemical components and processing those component coals in such a way that the composite, when complete, meets the customer's requirements throughout." Utilities, for example, prefer coal having low sulphur levels because of environmental restrictions related to sulphur emissions.

Using equipment estimated to be worth approximately one hundred million dollars, the blending process at the Plant utilizes "nuclear analytical devices" to measure the sulphur

content of the coal material. Based on these measurements, the coal is sorted into five different storage bins. Each bin contains coal having the same quality and stores 30,000 tons of coal. The quality of coal in a bin varies somewhat each day, however, depending on what coal seam is being mined at that time. According to one Consol manager, "[t]oday it might be 1.1 to 1.2 sulphur, because that's what [you're] producing. . . . Tomorrow it's another." In addition, within each bin, the coal is broken into ten "increments," with each increment reflecting a sulphur amount between the sulphur content limits of that bin.

Although all the coal at the Bailey Central Preparation Plant is blended at the plant to meet customer specifications, the blended coal still may be "incompatib[le]" with a customer's requirements because the instruments predicting the quality of the coal being currently mined from a seam are "only so accurate." Because the Bailey Plant has limited storage space, it utilizes the CCSC terminal in Baltimore, "a facility that can receive material on demand in order to keep [Bailey] operating." Therefore, in addition to serving as a shipping facility, the CCSC terminal also operates, in part, as a storage facility to "take[ ] up . . . the slack" when the Bailey mine produces coal that falls below customer requirements.

CCSC receives the majority of its coal by railway. When the coal arrives at CCSC, the trains are brought to its "dumper facility," which is located in the "thaw shed." The thaw shed contains large heaters used to heat the rail cars in cold weather in order to remove and separate frozen coal from the sides of the rail cars. The "dumper" then empties the rail cars by turning them upside down, and the coal is discharged across what is called a "grisly," which screens from the coal unwanted material such as rocks that may get into the coal during transit.

After the screened coal moves through the grisly, it then moves into "hoppers," which collect and control the rate of the coal and discharge onto a conveyor belt. The coal then leaves the thaw shed area and is conveyed on a belt to "Transfer

Point # 1," a housing station where samples of the coal sometimes are taken in order to be tested at a laboratory off-site. From this point, the coal is moved on conveyor belts directly to a shipping vessel or to "Transfer Point # 2," a meeting point for two more conveyor belts that take the coal either to the stockpiles or to a "surge bin," a large storage bin. Coal taken to the stockpiles is moved through "stacker re-claimers," large machines that have "bucket wheels" that both stack the coal for storage purposes and reclaim the coal when it is to be shipped. The coal is stored in different stacks based on its grade.

When coal is reclaimed, it can be mixed with other grades of coal as it is sent back down the conveyor belt and loaded into either the surge bin or onto a shipping vessel. According to CCSC, this remixing process constitutes a continuation of the blending process that began at the Bailey Plant. The remix-ing of inventory allows CCSC to combine coal of different sulphur and ash content in order to create a different average sulphur content for a cargo load in order to meet a customer's specifications. When mixed, the chemical content of the coal remains the same, although the average chemical content of a load may change. A typical CCSC cargo contains a mix or "blend" of coal from three to six stockpiles.

## B. Administrative History

CCSC filed personal property tax returns with the Mary-land State Department of Assessments and Taxation (herein-after "SDAT") for the machinery and equipment at its Balti-more facility for the 1997–1999 tax years. CCSC did not report any of its personal property as manufacturing property and stated that the nature of its business in Maryland was "exportation of coal." According to SDAT, CCSC's personal property, based on its returns, was assessed as follows:

| Tax Year | Date of Assessment Notice | Amount of Assessment (Baltimore City) |
|---|---|---|
| 1997 | 5/20/97 | $14,917,720 |
| 1998 | 1/7/99 | $14,596,480 |
| 1999 | 11/23/99 | $13,212,260 |

On May 19, 2000, CCSC filed amended returns for 1997–1999, and submitted an "exemption application for manufacturing and research and development, stating that most of its property was used in manufacturing." CCSC sought to amend its returns for the prior three-year period for 1997–1999 based on SDAT's practice at that time under Section 14–505 of the Maryland Tax–Property Article,[1] which allowed a taxpayer who had "failed to report [cost or market] information accurately [to] appeal the value or classification of personal property set forth in the notice of assessment . . . within 3 years of the date of the notice of assessment" by filing an amended return reclassifying the property. In addition to its effort to amend its 1997–1999 returns in order to receive the manufacturing exemption for those years, CCSC claimed in its 2000 tax return that its equipment was used in manufacturing and that the nature of its business in Maryland was "coal blending" instead of "exportation of coal."

On January 21, 2001, SDAT rejected CCSC's application for a manufacturing exemption, denied CCSC the manufacturing exemption for the years 1997–2000, and issued a notice of assessment for CCSC's property at $12,641,700 for 2000.

On February 7, 2001, CCSC appealed the notice of assessments and requested a hearing with SDAT, which held an

---

1. Maryland Code, Section 14–505 of the Maryland Tax–Property Article (1985, 2001 Repl.Vol.) provides:

(a) *In general.*—For personal property assessed by the Department, the owner who reported cost or market information for the personal property to the Department but failed to report the information accurately may appeal the value or classification of the personal property set forth in the notice of assessment by submitting a petition for review to the Department if:

(1) the owner claims that the personal property is valued at a higher value than if the information had been reported accurately; and

(2) the appeal is made within 3 years of the date of the notice of assessment.

(b) *Hearing required.*—If the requirements of subsection (a) of this section are met, the Department shall hold a hearing as provided under § 14–510 of this subtitle.

This section was repealed effective July 1, 2002. 2002 Md. Laws, ch. 529.

informal hearing on May 10, 2001. On August 16, SDAT issued final notices of assessment to CCSC and concluded that:

1) [CCSC] did not timely file an application for the exemption for the tax year under review.

2) Tax–Property Article §§ 14–906 and 14–915 restrict the time for a refund based on a missed exemption to one year.

3) [CCSC] is not legally entitled to a manufacturing exemption.

The final assessment notices also indicated the following assessments for the years 1997–2000:

| Tax Year | Date of Assessment Notice | Amount of Assessment (Baltimore City) |
|---|---|---|
| 1997 | 8/16/2001 | $13,362,510 |
| 1998 | 8/16/2001 | $13,097,690 |
| 1999 | 8/16/2001 | $12,825,400 |
| 2000 | 8/16/2001 | $12,641,700 |

During the time CCSC was appealing the assessments, SDAT revised its practice with respect to the limitations period regarding the manufacturer's exemption. Prior to its change in practice, SDAT allowed taxpayers to file amended returns seeking a manufacturer's exemption for up to three prior years pursuant to Section 14–505(a), the general limitations period allowed for reclassification of personal property.[2] On August 14, 2001, SDAT issued to its staff an internal memorandum stating that a one-year limitations period applied to taxpayers seeking a manufacturer's exemption for prior years in conformance with Sections 14–906[3]

---

**2.** *See supra* note 1.

**3.** Maryland Code, Section 14–906 of the Maryland Tax–Property Article (1985, 2001 Repl.Vol.), "Property tax refund criteria," provides:

(a) *No claim required.*—A person shall receive a refund of excess property tax paid on property without submitting a refund claim to the collector if the payment is erroneous due to a lower final property tax liability than:

(1) the advance property tax payment made under § 10–205 of this article; or

and 14–915 [4] of the Tax–Property Article.

On September 13, 2001, CCSC appealed to the Maryland Tax Court the final notices of assessment that SDAT had issued on August 16. The State Department of Assessments and Taxation and the Mayor and City Council of Baltimore responded. Judge Steven E. Silberg of the Tax Court held a

---

(2) the estimated property tax payment made under § 10–210 of this article.

(b) *When protest not required before refund claim submitted.*(1) If a person submits a refund claim to the collector within the time required by § 14–915 of this subtitle, the person shall receive a refund of excess property tax paid on personal property if the payment is erroneous due to:

i) a determination by the appropriate supervisor or the Department that the payment is based on an erroneous assessment that did not allow for an exemption to which the person was entitled by regulation, administrative interpretation, or controlling case law at the time of the assessment; or

ii) a lower final property tax liability than the advance property tax payment made under § 10–206 of this article.

(2) The person is eligible for a property tax refund under paragraph (1)(i) of this subsection whether or not the person has submitted a protest or appealed the assessment.

(c) *When claim for refund allowed.*—A person may claim a refund of the excess property tax liability fee if the payment is erroneous due to a lower final property tax liability than the advance payment made under § 10–205 of this article.

This section was amended effective July 1, 2002. 2002 Md. Laws, ch. 529.

4. Maryland Code, Section 14–915 of the Maryland Tax–Property Article (1985, 2001 Repl.Vol.), "Time for filing," provides:

To be eligible for a refund, a person must submit a refund claim on or before:

(1) 3 years from the date that the property tax is paid, for a claim under § 14–904, § 14–905(a), (b), or (d), or § 14–906(c) of this subtitle;

(2) 3 years from the date that the recordation tax is paid, for a claim under § 14–907 of this subtitle;

(3) 3 years from the date that the transfer tax is paid, for a claim under § 14–908 of this subtitle;

(4) 1 year from the date of finality of the erroneous assessment of personal property for which a claim is submitted under § 14–906(b)(1)(i) of this subtitle; or

(5) 1 year from the date that the tax rate is fixed for the taxable year following an advance payment of property tax on personal property for which a claim is submitted under § 14–906(b)(1)(ii) of this subtitle.

This section was amended effective July 1, 2002. 2002 Md. Laws, ch. 529.

two-day hearing on May 8, 2002 and June 13, 2002. On June 26, 2002, in an oral decision, Judge Silberg upheld SDAT's assessments. Judge Silberg determined that CCSC operated a storage and shipping facility, noting that storing and shipping are non-manufacturing activities under Maryland Code, Section 7–225(c) of the Tax–Property Article, which states that "[p]roperty does not qualify for the exemption under this section if the property is used primarily in administration, management, sales, storage, shipping, receiving, or any other nonmanufacturing activity."[5]

Judge Silberg also concluded that CCSC did not qualify for an exemption under Section 1–101(r), the general provision defining manufacturing in the Tax–Property Code,[6] because

---

**5.** Maryland Code, Section 7–255 of the Tax–Property Article (1985, 2001 Repl.Vol.) provides:

(a) *General Exception.*—Except as provided in § 7–109 of this title and in subsection (b) of this section, if used in manufacturing, the following personal property, however operated and whether or not in use, is not subject to property tax:

(1) tools;

(2) implements;

(3) machinery; or

(4) manufacturing apparatus or engines.

(b) *County exceptions.*—Except as provided by § 7–108 of this title, the personal property listed in subsection (a) of this section is subject to a county property tax on:

(1) 100% of its assessment in Garrett County, Somerset County, Wicomico County, and Worcester County; and

(2) 75% of its assessment in Allegany County.

(c) *Property used for nonmanufacturing activity.*—Property does not qualify for the exemption under this section if the property is used primarily in administration, management, sales, storage, shipping, receiving, or any other nonmanufacturing activity.

(d) *Application and granting of the exemption.*—In order to qualify for the exemption under this section, a person claiming the exemption must apply for and be granted the exemption by the Department.

**6.** Maryland Code, Section 1–101(r) of the Tax–Property Article (1985, 2001 Repl.Vol.) provides:

(1) "Manufacturing" means the process of substantially transforming, or a substantial step in the process of substantially transforming, tangible personal property into a new and different article of tangible personal property by use of labor or machinery.

(2) "Manufacturing" includes:

(i) the operation of sawmills, grain mills, or feed mills;

the provision defines manufacturing as "the process of substantially transforming, or a substantial step in the process of substantially transforming, tangible personal property into a new and different article of tangible personal property by use of labor or machinery." He stated:

Clearly, they are receiving coal primarily from their mine in Pennsylvania, though, in addition, they get some coal from some other sources.

It arrives by train. It is removed from the train and put into piles [at] the facility. And in order to satisfy demand from customers, removed from those piles and either shipped by boat or train to the customer.

In between those two events there is some fairly sophisticated process of blending that's taking place. The blending is to allow the meeting of specific requirements of the customer for sulphur, primarily, but also for possibly other chemical characteristics of the coal.

This blending process can take place either in the way the coal was stacked or the way the coal is removed from the cars or using some combination of the variety of equipment that's at the facility.

I think the testimony was fairly clear that [the] individual nuggets of coal that arrived are shipped out without any change occurring to them.

---

(ii) the operation of machinery and equipment used to extract and process minerals, metals, or earthen materials or by-products that result from the extracting or processing;
(iii) research and development activities, whether or not the company has a product for sale;
(iv) the identification, design, or genetic engineering of biological materials for research or manufacture; and
(v) the design, development, or creation of computer software for sale, lease, or license.
(3) "Manufacturing" does not include:
(i) activities that are primarily a service;
(ii) activities that are intellectual, artistic, or clerical in nature;
(iii) public utility services, including telephone, gas, electric, water, and steam production services; or
(iv) any other activity that would not commonly be considered as manufacturing.

The blending process may change, which other nuggets of coal are combined to that one when it's shipped. It may not be the entire batch it arrives with.

It's my determination that this whole process is not a substantial transformation or a substantial step in the process of substantially transforming this coal. The coal is pretty much the same form when it leaves as when it arrives.

Judge Silberg further found that Section 1–101(r)(2)(ii), which specifically includes within the definition of manufacturing "the operation of machinery and equipment used to extract and process minerals, metals, or earthen materials or by-products that result from the extracting or processing," did not apply to the CCSC facility either because "it's fairly clear that the facility in Maryland doesn't extract any minerals.... You have to do both extracting and processing to apply to that section." Judge Silberg also noted that CCSC had classified itself as a "transportation facility of some sort" in "documents that were filed with the government" such as environmental reports.

Finally, with respect to CCSC's argument that it was entitled to the three-year limitations period for the purposes of retroactive relief instead of one year, Judge Silberg acknowledged that "this [was] a change in the way [SDAT] had been doing things" but found that the Tax Code "dictate[d] that the shorter time period [was] the appropriate one." Judge Silberg issued an order affirming SDAT's assessments on July 23, 2002.

## C. Procedural History

On August 1, 2002, CCSC filed a timely petition for judicial review in the Circuit Court for Baltimore City. SDAT and the Mayor and City Council of Baltimore responded. On August 5, 2003, the Circuit Court reversed the Tax Court, concluding it had "erroneously interpreted the tax statute, specifically § 1–101(r), and misapplied it to the facts" because "CCSC's blending activities are a substantial step in the substantial transformation of coal." The Circuit Court judge observed:

CCSC's blending of coal and associated activities are vital because nuggets of raw coal do not automatically meet the needs of the end-users of the coal. The nuggets must be blended into batches, the chemical composite of which, when burned, meets the chemical needs of each specific end-user ... Without blending, the coal would be of no use to the end-users. The blending is crucial despite the fact that each individual nugget of coal remains unchanged.

With respect to whether the three-year or one-year limitations period applied, the judge concluded that the one-year statutory limitation period in Section 14–906(b) applied because it "specifically applies to refunds for assessments of personal property that are erroneous because they do 'not allow for an exemption to which the person was entitled by regulation, administrative interpretation, or controlling case law.'" While acknowledging that SDAT, in the past, had given taxpayers a three-year period to apply for manufacturing exemptions, it concluded that, "[a]round the time that CCSC filed it exemption applications, SDAT began applying the one-year time limitation to all taxpayers that applied for manufacturing exemptions [and] denied CCSC's exemption applications for this reason." The judge, thus, concluded that CCSC's 1997 and 1998 exemption applications should be denied but that the 1999 application was timely filed.

SDAT, the Mayor and City Council of Baltimore, and CCSC noted appeals to the Court of Special Appeals, and this Court issued, on its own initiative, a writ of certiorari, *Department of Assessments v. Consolidated Coal,* 380 Md. 230, 844 A.2d 427 (2004), prior to any proceedings in the intermediate appellate court. For the sake of clarity, we have rephrased the parties' questions presented for our review:

1. Did the Circuit Court err when it concluded that CCSC was entitled to the manufacturer's exemption under Section 7–225 of the Tax–Property Article?

2. Did the Tax and Circuit Courts err when they applied the one-year limitations period applicable to tax exemptions under Section 14–906(b) as opposed to the general three-

year limitation period for incorrect reporting under Section 14–505 of the Tax–Property Article? [7]

We conclude that the Tax Court was correct and reverse the judgment of the Circuit Court for Baltimore City with respect to its determination that CCSC was entitled to the manufacturer's exemption under Section 7–225. Because we determine that CCSC was not entitled to the exemption, we need not address which statute of limitations period applied.

## II. Standard of Review

The parties in this case dispute what standard of review applies to the Tax Court's conclusions. CCSC maintains that the facts before the Tax Court were undisputed; as such, in CCSC's view, the Tax Court's legal conclusion based on those undisputed facts should be treated as an issue of law and

---

7. The State Department of Assessments and Taxation presented the following questions:

1. Did the Circuit Court err when it substituted its judgment for the Tax Court's judgment where the Tax Court had factually found that CCSC's personal property was not used in manufacturing because it did not extract and process coal, its property was primarily used in receiving, storage, and shipping, and its activities did not meet the substantial transformation test?

2. Even assuming CCSC's property is used in manufacturing, did the Tax Court properly find that CCSC was ineligible for a manufacturing exemption for 1997–1999 because it did not timely file a manufacturing exemption application, and did not timely request an exemption under the "retroactive exemption" statutes?

The Mayor and City Council of Baltimore presented the following questions:

1. Was the tax court's decision that CCSC is not entitled to a manufacturing exemption supported by substantial evidence?

2. Was the tax court correct in applying a specific one-year limitation period a retroactive application for a tax exemption, as opposed to a general three-year limitation period for incorrect reporting?

Finally, CCSC presented its questions in the following way:

1. Whether the Circuit Court correctly determined on the undisputed facts that the sophisticated coal blending at CCSC entitles CCSC to a manufacturer's exemption from personal property taxation?

2. Whether the courts below erred in concluding that CCSC was not entitled to a manufacturer's exemption for the 1997 and 1998 years pursuant to the Department's longstanding interpretation of more than 20 years duration based on CCSC's amended returns reclassifying its property under Tax–Property Article § 14–505?

afforded no deference by the reviewing court. SDAT and the Mayor and City Council of Baltimore, on the other hand, argue that the reviewing court should defer to the Tax Court's conclusions because it made three factual rulings, and then applied the law correctly to those facts, namely that 1) CCSC was a shipping and storage facility and thus was excluded from the definition of manufacturing under Section 7–225(c); 2) CCSC does not extract and process coal and thus does not meet the definition of manufacturing under Section 1–101(r)(2)(ii); and 3) CCSC did not substantially transform or perform a substantial step in the substantial transformation of tangible personal property and thus does not meet the definition of manufacturing under Section 1–101(r)(1).

■ Because the Maryland Tax Court is an administrative agency, "[t]he standard of review for Tax Court decisions is generally the same as that for other administrative agencies." *Supervisor of Assessments v. Hartge Yacht Yard, Inc.,* 379 Md. 452, 461, 842 A.2d 732, 737 (2004). "When we consider an administrative agency decision, we review the agency's decision applying the same statutory standards as used by the preceding reviewing court." *Christopher v. Montgomery County Dept. of Health and Human Services,* 381 Md. 188, 197, 849 A.2d 46 (2004); *Spencer v. Maryland State Bd. of Pharmacy,* 380 Md. 515, 523–24, 846 A.2d 341, 346 (2004).

Under Section 13–532(a) of the Tax–General Article,[8] the standards of judicial review found in Sections 10–222 and 10–223 of the State Government Article applicable generally to

---

8. Section 13–532(a) of the Tax–General Article provides:
 (a)(1) A final order of the Tax Court is subject to judicial review as provided for contested cases in §§ 10–222 and 10–223 of the State Government Article.
 (2) Any party to the Tax Court proceeding, including a governmental unit, may appeal a final order of the Tax Court to the circuit court.
 (b) When an order of the Tax Court is subject to judicial review, that order is enforceable unless the reviewing court grants a stay upon such condition, security or bond as it deems proper.
 Maryland Code, Section 13–532 of the Tax–General Article (1988, 1997 Repl.Vol.).

administrative agencies likewise apply when reviewing decisions of the Tax Court. As we have explained:

> Accordingly, under this standard, a reviewing court is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law.

> On the other hand, where the Tax Court's decision is based on a factual determination, and there is no error of law, the reviewing court may not reverse the Tax Court's order if substantial evidence of record supports the agency's decision.

*Hartge Yacht Yard, Inc.*, 379 Md. at 461, 842 A.2d at 737 (citations omitted). Similarly, we have held that "determinations involving mixed questions of fact and law must be affirmed if, after deferring to the Tax Court's expertise and to the presumption that the decision is correct, a reasoning mind could have reached the Tax Court's conclusion." *NCR Corp. v. Comptroller.*, 313 Md. 118, 133–134, 544 A.2d 764, 771 (1988)(quoting *Comptroller v. NCR*, 71 Md.App. 116, 133, 524 A.2d 93, 101 (1987))(internal quotation marks omitted). *See also Colonial Pipeline Co. v. State Dept. of Assessments and Taxation*, 371 Md. 16, 28, 806 A.2d 648, 655 (2002)(stating that "[t]he applicable standard of judicial review of the final order of the Tax Court 'depends on whether the court is reviewing a question of law, question of fact, or a mixed question of law and fact' ").

 Ordinarily, then, a final order of the Tax Court must be upheld on judicial review if it is legally correct and reasonably supported by the evidentiary record. *Comptroller v. Clyde's of Chevy Chase, Inc.*, 377 Md. 471, 482, 833 A.2d 1014, 1020 (2003)(stating that, when reviewing a decision of the Tax Court, "we are limited to determining the legality of the decision of the Tax Court and whether there was 'substantial evidence' in the record to support its findings and conclusions")quoting *Supervisor of Assessments of Baltimore County v. Keeler*, 362 Md. 198, 207–08, 764 A.2d 821, 826 (2001). As we observed in *Insurance Commissioner v. Engelman*, 345

Md. 402, 411, 692 A.2d 474, 479 (1997), "[t]his standard of review is both narrow and expansive."

> It is narrow to the extent that reviewing courts, out of deference to agency expertise, are required to affirm an agency's findings of fact, as well as its application of law to those facts, if reasonably supported by the administrative record, viewed as a whole. The standard is equally broad to the extent that reviewing courts are under no constraint to affirm an agency decision premised solely upon an erroneous conclusion of law.

*Id.* (citations omitted). Under this standard, therefore, our scope of review remains narrow if a reasoning mind could have reached the Tax Court's conclusion based on the evidence. We will not broaden our scope of review and overturn the Tax Court's decision unless it was based on an error of law. *See Adventist Healthcare Midatlantic, Inc. v. Suburban Hosp., Inc.,* 350 Md. 104, 120, 711 A.2d 158, 166 (1998)(stating that "[a] court's role in reviewing contested case decisions made by administrative agencies 'is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised on an erroneous conclusion of law' ")(quoting *United Parcel v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226, 230 (1994)).

■ In addition, while ambiguous tax statutes are construed in favor of the taxpayer, *see Clyde's,* 377 Md. at 484, 833 A.2d at 1021, tax exemption statutes are strictly construed against the taxpayer and in favor of the taxing authority. In *Supervisor of Assessments of Baltimore County v. Keeler,* 362 Md. 198, 209, 764 A.2d 821, 827 (2001), we explained:

> It is fundamental that statutory tax exemptions are strictly construed in favor of the taxing authority and if any real doubt exists as to the propriety of an exemption that doubt must be resolved in favor of the State. In other words, "to doubt an exemption is to deny it".... [T]he State's taxing prerogative is never presumed to be relinquished and the

abandonment of this power must be proved by the party asserting the exemption.

(quoting *Chesapeake & Potomac Tel. Co. v. Comptroller,* 317 Md. 3, 11, 561 A.2d 1034, 1038 (1989)). Of course, while tax exemption statutes are to be strictly construed, the construction must be "a fair one, so as to effectuate the legislative intent and objectives." *Perdue Foods, Inc. v. State Dep't of Assessments and Taxation,* 264 Md. 672, 687–88, 288 A.2d 170, 178 (1972)(quoting *Maryland State Fair & Agric. Soc'y, Inc. v. Supervisor of Assessments of Baltimore County,* 225 Md. 574, 588, 172 A.2d 132, 139 (1961)). As we have often opined, we discern legislative intent by analyzing the statute's plain language, and we give effect to the statute as it is written where "the words of a statute, construed according to their common and everyday meaning, are clear and unambiguous." *Clyde's,* 377 Md. at 483, 833 A.2d at 1021 (establishing the standard of review for a tax statute)(internal quotation marks omitted)(quoting *Moore v. Miley,* 372 Md. 663, 677, 814 A.2d 557, 566 (2003)). Only where the statutory language is ambiguous do we look beyond the statute's plain language in order to discern legislative intent. *Id.*

### III. Discussion

SDAT and the Mayor and City Council of Baltimore first contend that, because Section 7–225(c) excludes "property . . . used primarily in . . . storage, shipping [or] receiving" from the manufacturer's exemption, the Tax Court correctly determined that CCSC was disqualified from receiving the tax exemption. The Circuit Court, in their view, did not afford the Tax Court the appropriate deference when it determined that the processing at CCSC is manufacturing because it is a substantial step in the processing of coal.

SDAT and the Mayor and City Council of Baltimore further argue that, if the "correctness as a matter of law" standard applies in this case at all, it is relevant only to the Tax Court's determination that Section 1–101(r)(2)(ii) of the Tax–Property Article requires both the extraction *and* processing of coal in order for the manufacturing exemption to apply. They assert

that a plain reading of Section 1–101(r)(2)(ii) requires that manufacturing in a mining and processing context requires the operation of machinery that is used to "extract *and* process" minerals. Because no extraction of minerals occurs at CCSC, they claim that this definition of manufacturing does not apply and disqualifies CCSC from the exemption.

In addition, SDAT and the Mayor and City Council of Baltimore maintain that, under the more general "substantial transformation" test, CCSC does not transform coal in a significant enough way nor does its blending process consti-tute a substantial step in the manufacturing process in order to be eligible for the manufacturer's exemption. The parties support their argument by stating that CCSC handles and ships coal that already has been processed; CCSC handles the processed coal at the "end" rather than the "beginning" of the manufacturing process; CCSC's blending process does not meet the common understanding of manufacturing; CCSC described itself as a shipping or transportation facility in government documents; and the scale of the operation and number of CCSC employees indicates that manufacturing was not occurring at the CCSC facility.

CCSC, on the other hand, begins its argument by maintain-ing that the Circuit Court did not err when it found that CCSC's blending activities were a substantial step in the substantial transformation of coal. According to CCSC, Ma-ryland case law regarding the manufacturer's exemption "re-quire[s] the conclusion that manufacturing is a continuous process that cannot be segregated by function for the purpose of an exemption or taxation." CCSC maintains that there is no "final product" of coal until after the blending occurs at its facility, that the Bailey mine could not function as it does without CCSC's blending process, and that "blending . . . is an integral part of the manufacturing chain involved in preparing coal for market."

CCSC furthermore argues that it also qualifies for the manufacturer's exemption because its equipment is used to "extract and process minerals . . . or by-products that result

from the extracting or processing" under Section 1–101(r)(2)(ii). CCSC interprets the statute in such a way that "or" is interchangeable with "and," maintaining that "[i]t makes no sense to construe the statute as requiring manufacturing to include only the extraction *and* processing of minerals and earthen material and in addition thereto, construing it to include the processing of byproducts of material extracted *or* processed." CCSC also contends that, because the provision states that " 'manufacturing' *includes* ... the operation of machinery and equipment used to extract and process minerals, metals, or earthen materials or by-products that result from the extracting or processing," it is indicating by way of example and not by limitation how manufacturing should be defined. In CCSC's view, because the statute was written in this way, "the determination whether *any other* activity constitutes manufacturing was still left to the courts."

CCSC also asserts that it is not a "storage, shipping, [or] receiving" facility disqualifying it for the exemption under Section 7–225(c). Rather, it claims that "[t]he evidence before the Tax Court was undisputed and demonstrated as a matter of law that each piece of equipment for which the exemption is sought is used in the manufacturing process." With respect to the fact that CCSC described itself as a transportation and shipping facility in other documents, CCSC maintains that the Court must "look beyond labels to the actual business of the taxpayer."

## A.

■ When the Tax Court made its decision, it determined that Section 7–225 of the Tax–Property Article, which provides a tax exemption from personal property used in manufacturing, did not apply to CCSC. Section 7–225 provides:

(a) *General Exception.*—Except as provided in § 7–109 of this title and in subsection (b) of this section, if used in manufacturing, the following personal property, however operated and whether or not in use, is not subject to property tax:

 (1) tools;

 (2) implements;

 (3) machinery; or

 (4) manufacturing apparatus or engines.

 (b) *County exceptions* . . . .

 (c) *Property used for nonmanufacturing activity.*—Property does not qualify for the exemption under this section if the property is used primarily in administration, management, sales, storage, shipping, receiving, or any other nonmanufacturing activity.

 (d) *Application and granting of the exemption.*—In order to qualify for the exemption under this section, a person claiming the exemption must apply for and be granted the exemption by the Department.

Maryland Code, § 7–225 of the Tax–Property Article (1985, 2001 Repl.Vol.). Because the statute clearly and unambiguously excludes "property . . . used primarily in . . . storage, shipping [or] receiving" from the exemption, we believe the Tax Court was legally correct when it determined that Section 7–225(c) disqualifies CCSC from receiving the tax exemption based on its finding that the CCSC facility is "a very large scale and sophisticated storage, shipping,[and] receiving facility."

 The basic facts that CCSC is primarily a shipping and storage facility that utilizes a "blending" procedure when it loads cargos of coal are undisputed. The record more than demonstrates that CCSC is, as the Tax Court decided, "a very large scale and sophisticated storage, shipping, [and] receiving facility." As we explained in *Comptroller v. SYL, Inc.,* 375 Md. 78, 105, 825 A.2d 399, 415 (2003), "where the facts before the administrative agency were undisputed, the legal conclusion based on those facts has been treated as an issue of law." We hold that CCSC, a shipping, storage, and receiving facility, is ineligible for the manufacturer's exemption because Section 7–225(c) specifically disqualifies such facilities from receiving the exemption.

## B.

In addition to concluding that CCSC is excluded under Section 7–225(c) from the exemption because it is a storage, shipping, and receiving facility, the Tax Court also determined that CCSC's activities did not qualify as manufacturing under Section 1–101(r) of the Tax–Property Article. CCSC argued that it qualified both under Section 1–101(r)(2)(ii), which specifically pertains to mining operations, and Section 1–101(r)(1), the general definition of "manufacturing." Section 1–101(r), in its entirety, provides:

(1) "Manufacturing" means the process of substantially transforming, or a substantial step in the process of substantially transforming, tangible personal property into a new and different article of tangible personal property by use of labor or machinery.

(2) "Manufacturing" includes:

(i) the operation of sawmills, grain mills, or feed mills;

(ii) the operation of machinery and equipment used to extract and process minerals, metals, or earthen materials or by-products that result from the extracting or processing;

(iii) research and development activities, whether or not the company has a product for sale;

(iv) the identification, design, or genetic engineering of biological materials for research or manufacture; and

(v) the design, development, or creation of computer software for sale, lease, or license.

(3) "Manufacturing" does not include:

(i) activities that are primarily a service;

(ii) activities that are intellectual, artistic, or clerical in nature;

(iii) public utility services, including telephone, gas, electric, water, and steam production services; or

(iv) any other activity that would not commonly be considered as manufacturing.

With respect to Section 1–101(r)(2)(ii), the definition of manufacturing includes "the operation of machinery and equipment used to extract and process minerals, metals, or earthen materials or by-products that result from the extracting or processing." In this instance, the Tax Court decided as a matter of law that the statute required machinery to extract *and* process minerals in order to qualify as manufacturing equipment. When it applied this conclusion of law to the facts of this case, the Tax Court decided that, because CCSC did not extract minerals at its facility, it did not meet the definition of manufacturing under Section 1–101(r)(2)(ii). We agree.

■ As the Tax Court pointed out, the plain language of the statute requires machinery to extract *and* process minerals in order to be classified as manufacturing equipment. In *Comptroller v. Fairchild Industries, Inc.*, 303 Md. 280, 285, 493 A.2d 341, 343 (1985), we explored how we ordinarily construe the word "and":

> According to Black's Law Dictionary 79 (5th ed.1979), the word "and" is used as "[a] conjunction connecting words or phrases expressing the idea that the latter is to be added to or taken along with the first.... It expresses a general relation or connection, a participation or accompaniment in sequence, having no inherent meaning standing alone but deriving force from what comes before and after. In its conjunctive sense the word is used to conjoin words, clauses, or sentences, expressing the relation of addition or connection, and signifying that something is to follow in addition to that which proceeds and its use implies that the connected elements must be grammatically co-ordinate, as where the elements preceding and succeeding the use of the words refer to the same subject matter."

Given the above, we then concluded that "and" ordinarily is not interchangeable with "or." *Id.* at 285–86, 493 A.2d at 343–44. Although some circumstances may require courts to construe "and" as "or," *see Little Store, Inc. v. State,* 295 Md. 158, 163, 453 A.2d 1215, 1218 (1983), we do so only "where it is necessary to effectuate the obvious intention of the legisla-

ture." *Fairchild Indus.*, 303 Md. at 286, 493 A.2d at 344. We discern no obvious intent on the General Assembly's part that "and" should be read as "or" here. In fact, when the provision was first introduced in 1965 in Senate Bill 43, the original language stated "extraction *or* processing." 1965 Md. Laws, ch. 94. This language was rejected, however, and the language "extraction *and* processing" was included instead. *Id.* Affirmatively rejecting "or" and opting for the word "and" suggests the General Assembly's strong intent to require equipment to both extract *and* process minerals in order to meet the definition of manufacturing established in Section 1–101(r)(2)(ii).

As for the more general definition of manufacturing in Section 1–101(r)(1), we also agree with the Tax Court that CCSC does not meet its requirements either. Enacted in 1996, Section 1–101(r)(1) codifies, in large part, the common law "substantial transformation" test. 1966 Md. Laws, ch. 174; 1996 House Committee on Ways and Means Floor and Concurrence Reports on House Bill 2 (stating that the "language [of Section 1–101(r)] conforms to the court decisions that have been made relating to property tax and sales tax exemptions for manufacturing"). Under Section 1–101(r)(1), " '[m]anufacturing' means the process of substantially transforming, or a substantial step in the process of substantially transforming, tangible personal property into a new and different article of tangible personal property by use of labor or machinery." In both instances, whether the entire process or a substantial step of the entire process transforms a product, the definition turns on whether a *"new and different article* of tangible personal property by use of labor or machinery" is produced. *Id.* (emphasis added). *See State Dept. of Assessments and Taxation v. Consumer Programs, Inc.,* 331 Md. 68, 73, 626 A.2d 360, 363 (1993)(stating that the "determinative factor" for the definition of manufacturing is "whether a product has gone through a substantial transformation in form and uses from its original state"). A review of our decisions applying the "substantial transformation" test prior to its codification in Section 1–101(r)(1) reveals that CCSC's activi-

ties fall short of what it requires because a "new and different article of tangible personal property" is not produced at the CCSC facility.

In *Perdue Foods,* 264 Md. at 690, 288 A.2d at 179, for example, we held that a chicken processing plant was engaged in manufacturing because the live chicken that arrived at the plant was much different from the packaged broiler that left it. In that case, live chickens were slaughtered, de-feathered, washed, eviscerated, cut into pieces, wrapped, chilled, and packaged before being shipped from the plant to be sold at the supermarket. *Id.* at 676–77, 288 A.2d at 172–73. Emphasizing how the product had changed, *see id.* at 689, 288 A.2d at 179, we thus concluded that the equipment at the Perdue facility fell under the manufacturer's exemption because the live chicken that had arrived at the plant had changed into a new and different product, namely, a broiler fit to be cooked.

In *Perdue, Inc. v. State Dept. of Assessments and Taxation,* 264 Md. 228, 286 A.2d 165 (1972), however, we declined to find that Perdue's artificial incubation of eggs constituted manufacturing. *Id.* at 237, 286 A.2d at 170. In that case, we defined manufacturing as "the application to material of labor or skill whereby the original article is changed to a new, different and useful article" and "emerges through the utilization of ingenuity and labor." *Id.* at 236, 286 A.2d at 169. Placing an egg in an environment conducive to its hatching, we concluded, did not constitute manufacturing because the egg was not changed due to effort on Perdue's part. *Id.* at 238, 286 A.2d at 170. We acknowledged, however, that "the line of demarcation between manufactured and non-manufactured products may at times be rather indistinct," and thus "the determinative factor [is] whether the product has gone through a substantial transformation in form and uses from its original state." *Id.* at 237, 286 A.2d at 170.

Similarly, we have found on many occasions that manufacturing exists when an article has undergone a substantial transformation into a new and different article as a result of human labor. Manufacturing occurred, for example, when

paper documents became electronic documents when recorded on magnetic tape, *Comptroller v. Disclosure, Inc.*, 340 Md. 675, 681, 667 A.2d 910, 912 (1995), film became pictures, *Consumer Programs*, 331 Md. at 76, 626 A.2d at 365, cotton became shirts, *Mayor and City Council of Baltimore v. Price*, 168 Md. 174, 181–82, 177 A. 160, 163 (1935), raw corn became canned corn, *County Com'rs v. B.F. Shriver Co.*, 146 Md. 412, 418, 126 A. 71, 73 (1924), and wheat became flour, *Carlin v. the Western Assurance Co.*, 57 Md. 515, 527–28 (1882).

On the other hand, we repeatedly have not found a substantial transformation where products left the facility in essentially the same form in which they arrived, even though, in some cases, some human labor was involved. For example, liquid sulphur remained liquid sulphur, even though the sulphur was heated while it was stored, *Pan Am. Sulphur Co. v. State Dept. of Assessments and Taxation*, 251 Md. 620, 626, 248 A.2d 354, 358 (1968), gas remained gas, but the application of changing pressure "performed no function whatever in the manufacture of gas," *Suburban Propane Gas Corp. v. Tawes*, 205 Md. 83, 93–94, 106 A.2d 119, 124 (1954), and pre-printed sheets remained sheets, even though they were placed in a binder before delivery to the customer, *H.M. Rowe Co. v. State Tax Comm'n*, 149 Md. 251, 257, 131 A. 509, 511 (1925).

■ Here, as the Tax Court found, the coal remained coal: the product left the CCSC facility in the same state as when it arrived. According to the Tax Court, it is "fairly clear that [the] individual nuggets of coal that arrive[ ] are shipped out without any change occurring to them" and "[t]he coal is pretty much the same form when it leaves as when it arrives." Because the CCSC facility does not change the coal into a "new and different article," we hold that its activities do not constitute manufacturing under Section 1–101(r)(1) of the Tax–Property Article.

## III.

The Tax Court correctly determined that CCSC was disqualified from receiving the manufacturer's exemption from

personal property taxation under Section 7–225(c) of the Tax–Property Article because CCSC is primarily a storage, shipping, and receiving facility. The Tax Court also was correct when it concluded that CCSC's "blending" activities do not constitute manufacturing under Section 1–101(r)(2)(ii) of the Tax–Property Article, which requires mining operations to both extract and process minerals in order to qualify as manufacturing, or under Section 1–101(r)(1) of the Tax–Property Article, which requires "a new and different article" to be produced. Accordingly, the Tax Court did not err when it decided that CCSC is not eligible for the manufacturer's exemption.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR ENTRY OF JUDGMENT AFFIRMING THE ORDER OF THE MARYLAND TAX COURT; COSTS TO BE PAID BY THE APPELLEE CONSOLIDATION COAL SALES COMPANY.*