510 A.2d 568

**SUPERVISOR OF ASSESSMENTS OF BALTIMORE CITY**

v.

**CHASE ASSOCIATES et al.**

**SUPERVISOR OF ASSESSMENTS OF BALTIMORE CITY**

v.

**Marvin ELLIN.**

No. 125, Sept. Term, 1985.

Court of Appeals of Maryland.

June 30, 1986.

William K. Hammond, Sp. Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Kaye Brooks Bushel, Asst. Atty. Gen., on brief), Baltimore, for appellant.

Evelyn W. Pasquier (Shale D. Stiller and Frank, Bernstein, Conaway & Goldman, on brief), Baltimore, for appellee Chase Associates et al.

Donald J. Katz, Baltimore, for appellee Marvin Ellin.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

MURPHY, Chief Judge.

Since 1979, the State Department of Assessments and Taxation has reviewed all real property assessments on a staggered triennial basis. *See* Maryland Code (1957, 1980 Repl.Vol.), Article 81, § 232(8).[1] Under the statutory procedure, the Department reviews each year one-third of the assessable real property in the state. The property is then assessed for a three-year period beginning on the next "semiannual date of finality," July 1. The assessment is derived from the property's full cash value on the "date of finality," January 1, preceding the three-year cycle. *See* §§ 14(b); 29A.

Ordinarily, the Department does not modify its assessment during the ensuing cycle. Under certain statutorily enumerated circumstances, however, property may be revalued and reassessed during an existing triennial cycle. These circumstances include those set forth in § 232(8)(d), which states that

"[a]ny property shall be reviewed, physically inspected, and revalued ... in any year that:

(1) The zoning classification of the property is changed;

---

1. Before 1979, this statute required that assessments be reviewed by the Department on an annual basis. By chapters 212 and 314 of the Acts of 1979, the statute was amended to provide for triennial review.

Unless otherwise indicated, all statutory provisions cited in this opinion are within Article 81. By chapter 8 of the Acts of 1985, the provisions of Article 81 governing real property taxation were recodified with amendments as part of the new Tax-Property Article. Because the recodification did not become effective until February 1, 1986, it is not relevant to our disposition of this case. *See* § 25 of chapter 8.

(2) A substantial change occurs in the use of the property;

(3) Extensive improvements are made to the existing property;

(4) The previous assessment was clearly erroneous due to an error in calculation or measurement of the improvements on the property."

In addition, § 19(a)(1) provides that "land may be reassessed whenever it has been subdivided or the character or use is changed after the date of finality but before the semiannual date of finality."

The principal issue in these consolidated cases is the legality of a mid-cycle reassessment of a 22-story residential apartment building in Baltimore City. The reassessment was instituted by the Supervisor of Assessments solely in response to the establishment of a condominium regime on the property. The Supervisor maintains that the reassessment was authorized by both § 232(8)(d)(2) and § 19(a)(1). We must determine, therefore, whether either of these statutory provisions provides an adequate legal foundation for the Supervisor's mid-cycle reassessment of this property.

## I.

Since the building's construction in 1967, it has accommodated a limited amount of office and restaurant space on its first two floors, and the remaining 20 floors have been devoted exclusively to residential apartment units. Until June 1981, the property was owned as a cooperative.

Chase Associates, a Maryland partnership and one of the appellees in this case, purchased all the outstanding stock of the cooperative on January 21, 1981. In June of that year, Chase filed a condominium declaration establishing a condominium regime of 246 units on the property. Sales of individual units began immediately, and the first settlement

was held in early July.[2]  Marvin Ellin, another appellee, purchased eleven units during the following four months.

Earlier, on December 12, 1980, the Supervisor had issued a Notice of Assessment for the apartment building for the triennial cycle beginning on July 1, 1981.  The date of finality for the assessment was January 1, 1981.  The notice showed a proposed full cash value for the land and the building of $3,603,700.00, which represented an increase of $1,259,500.00 over the valuation for the 1980/81 tax year.  The increased valuation was to be phased in over the ensuing triennial cycle.

In June 1981, Chase received a tax bill in the amount of $79,985.27, based upon an assessment of $1,294,260.00 for the first year of the triennial cycle.  Chase paid this bill, less an early payment discount, on July 1, 1981.  As individual units in the condominium were sold, the purchasers reimbursed Chase for their proportionate share of the real property taxes, prorated according to the time remaining in the tax year and the percentage of their ownership interest in the common elements.

On October 15 and 19, 1981, the Department issued new, individual Notices of Assessment for each of the 246 condominium units.  Each notice showed a proposed full cash value for a single unit; the aggregate of these values for all the units in the condominium was $14,175,350.00.  The corresponding reassessments were to apply retroactively to the existing triennial cycle that had begun on July 1, 1981.

Chase, to whom all of the reassessment notices were addressed, noted timely appeals and attended a hearing with the Supervisor on November 20.  On December 29, final Notices of Assessment were issued for each condominium unit.  These notices rescinded the reassessment for the first year of the triennial cycle, but affirmed the reassessments for the second and third years.

---

**2.**  As of July 1, 1983, 118 units had been sold to individual owners and the remaining 128 units continued to be owned by Chase.

Chase, Ellin, and other owners of condominium units filed timely appeals to the Property Tax Assessment Appeals Board from these final notices. The Board conducted a hearing on March 8, 1982, and, by orders dated March 19, upheld the reassessments shown on the final notices. From the Board's orders, two separate petitions were filed to the Maryland Tax Court, one individually by Ellin, and the other by Chase and the remaining unit owners.

The Tax Court in each case conducted de novo proceedings at which the parties stipulated to the relevant facts. The Supervisor argued in both cases that the condominium conversion constituted a substantial change in the use of the property for purposes of § 232(8)(d)(2), asserting that the use had changed from what it characterized as "rental apartment use" to "condominium use." The parties stipulated that the Supervisor had consistently treated the establishment of a condominium regime as a change in use for purposes of this statute. In the case involving Chase, the Supervisor advanced the alternative argument that the conversion entailed a subdivision of land within the meaning of § 19(a)(1), and that the reassessments were therefore also authorized under this provision.

The Tax Court concluded that the conversion did constitute a substantial change in use and, by separate orders dated October 29, 1984, upheld the reassessments in both cases solely on the basis of § 232(8)(d)(2). The Supervisor's alternative argument under § 19(a)(1) was summarily rejected by the Tax Court.

From the Tax Court's orders, two appeals were taken to the Circuit Court for Baltimore City, one by Ellin and the other by Chase and the remaining unit owners. The circuit court reversed in both cases, reasoning that the establishment of a condominium regime does not of itself constitute a change in use within the meaning of § 232(8)(d)(2). The court also upheld the Tax Court's conclusion that § 19(a)(1) was inapplicable. From the adverse judgments of the circuit court, the Supervisor appealed to the Court of Special

Appeals. We issued writs of certiorari on our own motion before the intermediate appellate court's consideration of the cases.

## II.

The scope of a circuit court's review in an appeal from the Tax Court is prescribed by § 229(*o*) of Article 81 (1957, 1980 Repl.Vol. & Supp. 1984):

"In any case, the circuit court for the county shall determine the matter upon the record made in the Maryland Tax Court. The circuit court shall affirm the Tax Court order if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record. In other cases, the circuit court may affirm, reverse, remand, or modify the order appealed from."

Thus, as we recently explained in *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 834, 490 A.2d 1296 (1985), "a reviewing court is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law."

■ Of course, various considerations may persuade a court to adopt a statutory interpretation advanced by an administrative agency, such as the Tax Court. *See Balto. Gas & Elec. v. Public Serv. Comm'n*, 305 Md. 145, 161–62, 501 A.2d 1307 (1986). However, an agency's identification or interpretation of the controlling law is entitled to no presumption of correctness; the reviewing court must apply the law as it understands it to be. *See, e.g., Supervisor of Assess. v. Carroll*, 298 Md. 311, 315–19, 469 A.2d 858 (1984); *Supervisor v. Ort Children Tr.*, 294 Md. 195, 200–12, 448 A.2d 947 (1982); *Condominium Owners v. Supervisor*, 283 Md. 29, 36, 388 A.2d 116 (1978); *Comptroller v. Mandel Re-Election Com.*, 280 Md. 575, 578–85, 374 A.2d 1130 (1977).

The issues before us in this case involve the proper interpretation of two statutory provisions, and are therefore solely questions of law. As indicated earlier, the Tax Court

rejected the Supervisor's argument that the mid-cycle reassessment was authorized by § 19(a)(1), which states that "land may be reassessed whenever it has been subdivided ... after the date of finality but before the semiannual date of finality." In so doing, the Tax Court concluded that the word "land," as used in this statute, did not encompass improvements such as the appellees' building. The Tax Court, therefore, did not reach the issue of whether the condominium conversion constituted a subdivision of the building itself, but held only that the conversion did not constitute a subdivision of the land for purposes of this statute.

■ Although the Tax Court did not set forth its reasons for reaching this decision, we conclude that the agency has correctly interpreted the language in question. The distinction for purposes of this statute between land and improvements is recognized in the preceding sentence of § 19(a)(1), which states that, "[i]n valuing and assessing real estate, the land itself and the buildings or other improvements thereon shall be valued and assessed separately; and the buildings or improvements not substantially completed on the date of finality, semiannual date of finality or quarterly date of finality shall not be assessed at all." Because the legislature is presumed to use words consistently throughout a particular enactment, the clear meaning imparted to a word in one part of a statute may be ascribed to that word elsewhere in the statute absent a manifest contrary purpose. *See Railroad Co. v. Lichtenberg,* 176 Md. 383, 391, 4 A.2d 734, *appeal dismissed sub nom. United States v. Baltimore & Annapolis Railroad,* 308 U.S. 525, 60 S.Ct. 297, 84 L.Ed. 444 (1939); *Gregg v. Manno,* 667 F.2d 1116, 1117 (4th Cir.1981); 2A N. Singer, *Sutherland on Statutes and Statutory Construction* § 47.16 (rev. 4th ed. 1984).

In addition, the filing of a condominium declaration cannot be said to "subdivide" the land upon which the condominium units are located. Clearly, there was no subdivision of land in the narrow sense that this word is employed in

land use law, as a formal division of a parcel of land into several smaller lots to be separately sold, leased, or developed. *See* 7 P. Rohan, *Zoning and Land Use Controls* § 45.01[2] (1986). Furthermore, although it is true that a condominium declaration does apportion the ownership rights in the common elements among the unit owners, each unit owner's interest in the common elements, including the land, is an undivided interest. *See* Maryland Code (1981 Repl.Vol.), § 11–107(a) of the Real Property Article. Thus, the establishment of a condominium regime no more entails a "subdivision" of land than does a transaction by which the sole owner of a parcel of land retitles his land in the names of himself and another as tenants in common. We conclude, therefore, that the circuit court was correct in upholding the Tax Court's decision on this issue.

We also find no error in the circuit court's reversals of the Tax Court's rulings as to § 232(8)(d)(2). As indicated earlier, this statute provides that "[a]ny property shall be reviewed, physically inspected, and revalued ... in any year that ... [a] substantial change occurs in the use of the property," and it was upon this ground that the Tax Court upheld the Supervisor's mid-cycle reassessments in both of the cases below.

The Tax Court's rulings in each case were premised upon its identification of change in use with change in value. In the *Chase* case, for example, the Tax Court stated that "it is the opportunity or likelihood of increased value which triggers the Supervisor's right to invade the triennial assessment process" through reassessment under § 232(8)(d). Observing that "the filing of a condominium declaration has historically altered the value of the property," the agency concluded that the filing of a condominium declaration initiated a "substantial change in use" within the meaning of this statute.

In interpreting a legislative enactment, our function is to ascertain the legislative purpose underlying the enactment and to interpret its language in the manner that will most

effectively accomplish this purpose. *See Hawkins v. State,* 302 Md. 143, 147, 486 A.2d 179 (1985); *Sites v. State,* 300 Md. 702, 710, 481 A.2d 192 (1984); *Management Personnel Serv. v. Sandefur,* 300 Md. 332, 341, 478 A.2d 310 (1984). In so doing, however, we are constrained to accord the enactment no broader meaning than that its words will bear. *See Guardian Life Ins. v. Ins. Comm'r,* 293 Md. 629, 643, 446 A.2d 1140 (1982); *Gov't Employees Ins. v. Ins. Comm'r,* 273 Md. 467, 481, 330 A.2d 653 (1975); *Amalgamated Ins. v. Helms,* 239 Md. 529, 535, 212 A.2d 311 (1965). We are also guided by the principle that language should be assigned its ordinary meaning unless a contrary legislative purpose is manifested. *See In re Arnold M.,* 298 Md. 515, 520, 471 A.2d 313 (1984); *Mauzy v. Hornbeck,* 285 Md. 84, 92–93, 400 A.2d 1091 (1979); *Coleman v. State,* 281 Md. 538, 546, 380 A.2d 49 (1977).

The purpose underlying the mid-cycle reassessment procedure of § 232(8)(d) was clearly to improve the accuracy with which a property's assessed value reflects its current value throughout a triennial cycle. In implementing this purpose, however, the legislature chose not to provide generally that any change in value would precipitate mid-cycle reassessment, but rather to link reassessment to the occurrence of certain specified events, including a substantial change in use, likely to presage a change in value. The legislature's reasons for drafting the statute in this manner may well have included lessening the tremendous administrative burden the more general provision would have created, and increasing the predictability and consistency with which the reassessment process would be invoked.

To interpret "change in use" to include any event that might change the value of the property would stretch the word "use" well beyond the meaning it can bear, and would disregard the legislature's deliberate choice of a specific rather than a general drafting style. The ordinary meaning of use is simply the purpose or object to which something is applied. *See Webster's Third New International Dictionary* 2523 (1971, unabridged). More specifically, use in the

present context refers to the nature of the activities pursued on the property. *See Martin v. Liberty Cty. Bd. of Tax Assessors*, 152 Ga.App. 340, 262 S.E.2d 609, 612 (1979). Although a change in use may occasion or coincide with a change in value, the concepts are entirely distinct, and the Tax Court erred in equating them for purposes of § 232(8)(d)(2).

A condominium regime is nothing more than a form of ownership of real property. 1 P. Rohan & M. Reskin, *Condominium Law and Practice* § 1.01[1] (1985); Payne, *Condominiums and the Ancient Estates in Land: New Context for Old Learning*, 14 Real Est. L.J. 291 (1986). This fact was expressly recognized by the drafters of the Maryland Condominium Act. *See* Condominium Revision Committee of the Real Property, Planning and Zoning Section, Maryland State Bar Association, Committee Report to the General Assembly (1974) (quoting P. Rohan and M. Reskin, *supra*); Comment to former § 11–120 of the Real Property Article (1975 Supp.) ("The Committee firmly concluded that 'condominium' is a matter of title (i.e., a form of ownership) ....."). Thus, although the establishment of a condominium regime on property previously owned as a cooperative does constitute a change in form of ownership, it does not, of itself, constitute a change in the use of the property. *Cf. Bridge Park Co. v. Borough of Highland Park*, 113 N.J. Super. 219, 273 A.2d 397, 398–99 (App.Div. 1971) (condominium conversion held not to constitute a change in use for zoning purposes); *Graham Court Assoc. v. Town Council, etc.*, 53 N.C.App. 543, 281 S.E.2d 418, 420–23 (1981) (same); *Baker v. Town of Sullivan's Island*, 279 S.C. 581, 310 S.E.2d 433, 435–36 (Ct.App.1983) (same).

█  In the present case, it is undisputed that the nature of the activities pursued on the appellees' property remained unchanged following the condominium conversion. The circuit court was, therefore, correct in holding that there was no change in use for purposes of § 232(8)(d)(2),

and, consequently, that the mid-cycle reassessment was not authorized by this provision.

In so concluding, we are mindful of the parties' stipulation that the Supervisor has consistently interpreted the establishment of a condominium regime as a change in use for purposes of reassessment under § 232(8)(d)(2). It is, of course, true that consistency of application is one of the many factors a court will consider in assessing the weight to be accorded an agency's interpretation of a statute. *See Balto. Gas & Elec., supra,* 305 Md. at 161–62, 501 A.2d 1307. However, as we indicated in *St. Dep't of A. & T. v. Greyhound Comp.,* 271 Md. 575, 589, 320 A.2d 40 (1974), "the unvarying construction of a law by the agency charged with its enforcement over a long period of time ... cannot override the plain meaning of the statute or extend its provisions beyond the clear import of the language employed." *See also Macke Co. v. Comptroller,* 302 Md. 18, 22–23, 485 A.2d 254 (1984); *State Farm v. Md. Auto. Ins. Fund,* 277 Md. 602, 605–06, 356 A.2d 560 (1976); *Atlantic, Gulf v. Dep't of Assess. & T.,* 252 Md. 173, 182–83, 249 A.2d 180 (1969); *Comptroller v. A. Cyanamid Co.,* 240 Md. 491, 493, 504–08, 214 A.2d 596 (1965).

JUDGMENTS AFFIRMED, WITH COSTS.