943 A.2d 100

**STELLAR GT**

v.

**SUPERVISOR OF ASSESSMENTS.**

**No. 2845, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

March 3, 2008.

Robert C. Park, Jr. (Linowes and Blocher, LLP on the brief), Bethesda, for Appellant.

David M. Lyon (Douglas F. Gansler, Atty. General on the brief), Baltimore, for Appellee.

Panel: JAMES R. EYLER, WOODWARD, RAYMOND G. THIEME, JR., (Ret'd, Specially Assigned) JJ.

RAYMOND G. THIEME, JR., Judge, Ret'd, Specially Assigned.

This appeal raises the question of when the Supervisor of Assessments for Montgomery County, appellee, is authorized by statute to revalue a property during the three year period between regular valuations. Md. Ann.Code, Tax–Property Article, Section 8–104(c) (2001 Repl.Vol.) lists six situations in which "real property shall be revalued" if they occur "[i]n any year of a 3–year cycle." Believing that one of those situations existed, the appellee revalued the Georgian Towers, a Silver Spring apartment building owned by appellant, Stellar GT, TIC, LLC, *et al.*, less than six months after a regular triennial assessment. Disagreeing that any of those situations existed, appellant protested. The Maryland Tax Court upheld the Supervisor and, in turn, was upheld by the Circuit Court for Montgomery County. In this appeal, appellant raises three questions:

1. Did the circuit court err in interpreting Section 8–104(c)(1)(iii), Tax Property Article, Annotated Code of Maryland (the "Maryland Tax Code") to allow Assessment II reportedly based on substantially completed improvements adding at least $50,000 in value to the Property, but triggered by a sale of the Property that exceeded the Assessment I value?

2. Did the circuit court err in interpreting Section 8–104(c)(1)(iii) of the Maryland Tax Code to allow a complete mid-cycle revaluation approximating the subsequent sale price, rather than limiting the revaluation to the amount of value added by substantially completed improvements to the Property?

3. Did the circuit court err in interpreting Section 8–401(f)(4) of the Maryland Tax Code to allow Assessment II, even though it was after the Date of Finality for substantially completed improvements made during 2003?

The appellee condenses these three questions into one, asking:

When the value of the subject property has increased by more than $50,000 because of substantially completed improvements in the previous calendar year, and this increase in value is not captured in the existing assessment, does § 8–104(c) mandate and/or authorize the Supervisor to issue a new property assessment before the next tax year to establish the new, correct value?

We agree with appellant as to the threshold question of whether a mid-cycle reassessment was permitted by § 8–104(c) of the Tax Property ("T.P.") Article, which provides:

(1) In any year of a 3–year cycle, real property shall be revalued if any of the factors listed below causes a change in the value of the real property:

(i) the zoning classification is changed at the initiative of the owner or anyone having an interest in the property;

(ii) a change in use or character occurs;

(iii) substantially completed improvements are made which add at least $50,000 in value to the property; (iv) an error in calculation or measurement of the real property caused the value to be erroneous; (v) a residential use assessment is terminated pursuant to § 8–226 of this title; or (iv) a subdivision occurs. For purposes of this subsection, "subdivision" means the division of real property into 2 or more parcels by subdivision plat, condominium plat, time-share, metes and bounds, or other means.

The Tax Court decided that the assessment was permitted, based upon the following evidence:

George Thomas Borger, the President of Borger Management, Inc., testified that he had been the property and construction manager for the Georgian Towers beginning in 1988. In that capacity, he began preparing for the upcoming 2004–2006 reassessment by going to the office of the Supervisor of Assessments and speaking with Mr. Gantz in October of 2003. Borger provided an income questionnaire and documentation of the scope of improvements made over the past three to five years. The total construction cost was just under $ 13 million, of which approximately 50% represented the past three years and $ 7 to 8 million was for deferred maintenance, rather than enhancements. At the time he met with Gantz, all of the work was completed except for the "final touches" to the smaller of two lobbies. That work, totaling $ 425,000, was shown on the "Construction Summary" submitted to Gantz, as was $ 195,000 worth of outstanding work on the leasing office. Gantz was informed of the status of the work and Borger recalled that they discussed the fact that Gantz had not "looked at the property in any detail."

Early in December, 2003, Gantz called to inform Borger that the assessment was completed and the new value was approximately $ 52 million. Within a month, Borger received a notice setting the value at $ 52,561,600. At the time he was dealing with Gantz, Borger had an idea that "something was going on," but he did not know details about a sale to the

appellant, Stellar Management, which would occur in March of 2004, at a price of $ 89 million. In July of 2004, Stellar informed Borger that it had received notice of the mid-cycle reassessment.

Daniel Ercolani, Supervisor of Assessments, confirmed that Gantz had not visited the property before issuing his assessment. He testified that the relevant statutes forbade reassessment during the middle of a triennial cycle unless one of the six specified factors existed. He acknowledged that he was not permitted to change a regular assessment simply because the property sold for a price higher than that assessment.

Knowing that one of the legitimate factors for reassessment is "substantially completed improvements ... which add at least $ 50,000 in value to the property," Ercolani had a method of uncovering these situations. In addition to regularly reviewing reports of property sales, Ercolani received from the county permit office on a quarterly basis, information about permits granted for additions or new construction. Based on that information, he would send an assessor to perform a physical review of the property to determine whether the value of the new construction or addition was over $ 50,000.

In the instant case, Ercolani did not become aware of the Georgian Towers renovations through that procedure. The last assessor to visit the property in "mid–2003" did not provide information to him and he did not know in which quarter of the year the lobby work was done. It was not until he learned of the sale price that he became concerned that his office had "missed the valuation by such a large margin." The difference was so great that he directed assessors to "take another look to see if we had missed something." These assessors "went to the county On–Line Permit System that we have access to, and they pulled several permits that alerted us" to the renovation. Ercolani then sent the assessors out to perform a physical review of the property. He testified that, "[a]fter hearing the report back to me from the field and looking at the permits, it was my opinion that there had been

Fifty Thousand Dollars spent in 2003." Ercolani then "trended [the rents] up to what I thought were accurate rentals for 2004, 2005 ... mimicking what an investor does when they buy a property. They're looking into the future of what the rents would be for a renovated building." He "lowered [the expenses stated by Borger] to be reflective more for renovated property where deferred maintenance seemingly had been corrected" and he used the sales price and in "general terms" other market activity in Silver Spring to revalue the property.

Ercolani did not take into account the costs of the renovations nor did he distinguish between deferred maintenance and improvements, because he believed that both added to the value of the property. Ercolani admitted that the documents submitted by Borger showed the value of the lobby work as $ 425,000. He conceded that the reason he eventually focused on the Georgian Towers was not that his employees had inspected the property and reported that there might be "substantially completed improvements ... which add at least $ 50,000 in value to the property," or because the issuance of permits for the work suggested that was the case. Instead, he testified unequivocally, "The sale triggered it to come to my attention."

The Tax Court characterized the evidence as "basically not in dispute" and concluded:

> ... as of the beginning of '03, much of the renovation, although much of it was completed, there was a renovation of the East Lobby was—based on the documentary evidence as well as the testimony—was going to cost approximately Four Hundred and Fifty Thousand Dollars. And that apparently was performed predominantly in the calendar year 2003, although some may have been performed in '04, but that's not really consequential to the decision in this case.
>
> There is no dispute that the renovation of this particular property, the subject property, added at least Fifty Thousand Dollars in the value in the calendar year 2003. If there was a dispute, that's my finding as a matter of fact, that based upon the evidence that I've heard, that the

renovation did, in fact, increase the value of the property at least Fifty Thousand Dollars during 2003.

. . .

Now, in this particular case, there were some discussions between the Agent for the property owner, as well as Mr. Gantz—well known to the Court—an Assessor with Montgomery County for many, many years. And there were some discussions, there was some information passed on between the two regarding the renovations. But I'm not—I don't think that that has a particular impact on what the law is in this particular case. Mr. Gantz was trying to do his job, and, as far as I could see, the Petitioner was trying to assist Mr. Gantz in doing his job. But Mr. Gantz, after reviewing the information, increased the value from, I think, Forty Million to approximately Fifty-two Million. But that is not what caused the real issue in this case.

What happened was, in March of '04, the property sold for approximately Eighty-nine Million Dollars, and that required the Supervisor and others with the Department of Assessments in Montgomery County to take a hard look to find out what happened, which, I think, is the right way to handle something like that. If you have a Fifty-two Million Dollar assessment as of January 1, '04, and the property sells for Eighty-nine Million, if I was in charge of the Department, I'd be asking some questions too. So I think that was an appropriate response.

And, after looking at it, it was very obvious that there had been over Fifty Thousand Dollars in renovation or increased value due to substantial renovations, which occurred over this time period. Well, there's little question that prior to '03—in '03 there were at least Fifty Thousand that increased the value at least Fifty-two Thousand and Fifty Thousand Dollars. And the reason that's important is based on the Code, Section 8–104(c): In any year of a three year cycle—I'm reading from the Code—a revaluation is required and, in fact, real property shall be revalued—key word, revalued—if any of the factors listed below cause a change in the value of the real property.

Of course, the pertinent section here is (c)(iii) where it states that substantially completed improvements are made, which add at least Fifty Thousand Dollars in value to the property.

And then if you go down farther it says, the Department, or the Supervisor, shall revalue real property under subparagraphs (1)—excuse me, that section doesn't apply—shall revalue the property effective—and revalue to me means revalue and revalue is not adding on a value, it is, I think, starts the process all over again, frankly. And that's really the only thing, if you read all the sections in context and understand the relationship between 8–104 and 8–401 and the entire assessment process, it's the only thing that makes reasonable—makes any reasonable and practical sense in terms of the assessment valuation process in the State of Maryland.

Under 8–104, the Department of Assessments, from my standpoint or of my interpretation of the statute, is mandated to do a mid-cycle review under this particular circumstance. And, as Mr. Lyon has pointed out, I think it is a trigger. It is not a trigger just to add the value of the improvements, it's a trigger to revalue the improvements. To merely add the value of the improvements would require the Assessor only to consider one of the approaches and not all three of the approaches because to do otherwise would basically minimize the market approach as well as the income approach. And from my standpoint, it would seem reasonable that the sale in March of '04 had to be considered because that revaluation under 8–401 requires that you have a different date of finality. You have a semi-annual date of finality, which would have been, I believe, July 1 st, which means that everything—any new evidence which occurred prior to that date had to be considered by the Assessor in making their determination.

The Circuit Court for Montgomery County agreed:

They do have that triggering event of the improvements, and that's the issue I guess for the [C]ourt of [S]pecial [A]ppeals, with respect to what you all have argued. I

mean, you know, I think they're good, very good legal arguments. I compliment both counsel for the very clear way that you laid them out. They're not even too difficult for me to understand, despite the fact that, as I said, I didn't do this kind of work.

Both arguments make sense to me, quite honestly, but I do have to give that slightly elevated deference to the Tax Court in this case, and the fact of the matter is that I believe, that the Tax Court did in fact, make the appropriate determination and ruling in this case, based on their interpretation of the law, and based on the evidence that was presented to them in this particular hearing.

We begin by recognizing that the Tax Court is an administrative entity, not a judicial one, and its decisions are accorded great deference. We review those decisions in a light most favorable to the agency charged with administering the law, in this case, that of the Supervisor of Assessments. We will affirm the Tax Court if its factual findings are supported by substantial evidence appearing in the record and its conclusions are not erroneous as a matter of law. "Substantial evidence" is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *AT & T Communications of Maryland, Inc. v. Comptroller of the Treasury,* 176 Md.App. 22, 28, 932 A.2d 748 (2007).

We are not required to yield to the administering agency's legal conclusions, but, due to its expertise, we do grant that agency a degree of deference even with regard to some legal issues. *Maryland Aviation Administration v. Noland,* 386 Md. 556, 572, 873 A.2d 1145 (2005). In *Noland,* the Court of Appeals stated that the agency's decision is *prima facie* correct and presumed valid:

... a court's task on review is not to 'substitute its judgment for the expertise of those persons who constitute the administrative agency,' ... Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute

which the agency administers should ordinarily be given considerable weight by reviewing courts.... ("The interpretation of a statute by those officials charged with administering the statute is ... entitled to weight'). Furthermore, the expertise of the agency in its own field should be respected....

*Id.* at 571–72, 873 A.2d 1145 (internal citations omitted).

██ Repeatedly, Supervisor Ercolani stated that the laws under which he operates prohibit a mid-cycle reassessment merely because a property was sold in the middle of a triennial cycle for a price higher than the value determined at the last regularly scheduled assessment. In his testimony to the Tax Court, Ercolani identified sources he used to derive information that could establish a legitimate basis for a mid-cycle reassessment under § 8–104(c)(iii):

1. The existence of substantially completed improvements adding at least $ 50,000 in value to the property could be revealed by the issuance of building permits, information available to his office.

2. Visual inspection by assessors.

3. Review of documents submitted by the property owner.

He did not use any of those methods in the instant case. As to the first method, it was not until *after* Ercolani had decided that the sale price indicated that the regular assessment must have been erroneous that he asked to see the relevant building permits. As to the second, the assessor, Gantz, did not conduct a visual inspection of the renovation work. As to the third, the documents submitted to Gantz for his use in preparing the regularly scheduled assessment showed the work being performed on the lobby and listed its value as $ 425,000.

 The evidence established that Gantz failed to take advantage of opportunities to acquire accurate information. The result was that his assessment of the property's value was wide of the mark, as demonstrated by its subsequent sale, which established a much higher fair market value. The Supervisor's desire to limit the damage done by the faulty

assessment is understandable, but it does not justify disregard of the conditions imposed by the statute. Had the legislature intended to provide protection against inadequate work by assessors, it could have done so.[1] Indeed, subsection (iv) permits a mid-cycle valuation where "an error in calculation or measurement of the real property caused the value to be erroneous." The instant case does not fall within that category, since the assessor's error was not one of arithmetic, but one of professional judgment.[2]

In that situation, the Court of Appeals has stated that "[t]he language of these statutes reveals that they were not intended to authorize a retroactive increase in the assessment and taxation for prior years because of an asserted mistake in valuation, or some other alleged mistake." *Montgomery County Board of Realtors v. Montgomery County*, 287 Md. 101, 108, 411 A.2d 97 (1980).

Our interpretation is consistent with the Court of Appeals' interpretation of the legislative intent:

The purpose underlying the mid-cycle reassessment procedure of § 232(8)(d)[3] was clearly to improve the accuracy with which a property's assessed value reflects its current value throughout a triennial cycle. In implementing this purpose, however, the legislature chose not to provide generally that any change in value would precipitate mid-cycle reassessment, but rather to link reassessment to the occurrence of certain specified events, including a substantial change in use, likely to presage a change in value. The

---

1. Our task in construing a statute is to ascertain and carry out the legislative intent by considering the language of the statute in its natural and ordinary signification, and we may not insert words to make a statute express an intention not evidenced in its original form. *Rome v. Lowenthal*, 290 Md. 33, 41, 428 A.2d 75 (1981).

2. Even if the assessor had not made a mistake, the mere fact that a sale between regular assessments was "at a price in excess of the value placed on the property at the time of assessment does not necessarily indicate erroneous valuation." *Montgomery County Board of Realtors v. Montgomery County*, 287 Md. 101, 110, 411 A.2d 97 (1980).

3. Currently § 8–104(c)(1) of the Tax–Property Article.

legislature's reasons for drafting the statute in this manner may well have included lessening the tremendous administrative burden the more general provision would have created, and increasing the predictability and consistency with which the reassessment process would be invoked.

*Supervisor of Assessments of Baltimore City v. Chase Associates*, 306 Md. 568, 577, 510 A.2d 568 (1986). Significantly, the Court refers to a sequence of events in which the statutory triggers "presage" a change in value. In the instant case, that sequence effectively was reversed when the Supervisor used the sale price of the property as a retroactive justification for a reassessment based on improvements that existed at the time of the previous regular assessment.

In essence, the Supervisor is attempting to do with regard to an individual property what the county is prohibited from doing generally. In *Montgomery County Board of Realtors*, *supra*, 287 Md. 101, 411 A.2d 97, the Court of Appeals invalidated a county tax statute that created a tax on income when the seller of property was "revealed to have derived real income from his property in that he enjoyed the use of the property at a lesser tax burden than the sale reveals he should have borne." *Id.* at 102, 411 A.2d 97. The Court held that this attempt to "reassess and tax real property after the date of finality" was in "direct conflict with the [statutory provision] relative to the date of finality and the process to be followed where an erroneous assessment is made." [4]

We find that the facts presented to the Tax Court, as informed by the expertise of the agency, do not support the legal conclusion reached by that court. The holdings of the Court of Appeals do not support a general negation of finality during the three year period between assessments and these circumstances do not fall within any of the enumerated exceptions to the statutory scheme. In light of this conclusion, we need not consider the remaining issues raised by the parties.

---

**4.** The Court also found that the statutory scheme created by the State had preempted county action in this field. *Id.* at 110, 411 A.2d 97.

JUDGMENT REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR ENTRY OF A JUDGMENT REVERSING THE DECISION OF THE TAX COURT.

COSTS TO BE PAID BY APPELLEE.