961 A.2d 1119

**SUPERVISOR OF ASSESSMENTS**

v.

**STELLAR GT.**

No. 36, Sept. Term, 2008.

Court of Appeals of Maryland.

Dec. 12, 2008.

660

David M. Lyon, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., Baltimore) on brief, for Petitioner.

Robert C. Park, Jr. (Gabrielle M. Duvall, Linowes, Blocher LLP, Bethesda) on brief, for Respondent.

Argued Before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY and JOHN C. ELDRIDGE (Retired, Specially Assigned), IRMA S. RAKER (Retired, Specially Assigned), JJ.

BATTAGLIA, Judge.

In order to determine the value of a piece of real estate upon which its tax is derived, the Maryland State Department of Assessment and Taxation assesses[1] real property once every three years; any increase in the value is "phased in"[2] over a period of three years. *See* Section 8–103 of the Tax–Property Article, Maryland Code (1985, 2001 Repl.Vol.).[3] The property is valued as of "the January 1 immediately before the 1st taxable year[4] to which the assessment based on the new

---

1. "Assess," as applied to real property, is defined in Section 1–101(b)(1) of the Tax–Property Article, Maryland Code (1985, 2001 Repl.Vol.), as "to determine the phased-in full cash value or use value to which the property tax rate may be applied." The words "assess" and "value" herein shall be used interchangeably as will "assessment" and "valuation."

2. The "phased in value" of a property means that for the 1st, 2nd or 3rd year of a 3–year cycle, the prior value is increased "by one-third, two-thirds, or the full amount by which the value increased over the prior value based on a physical inspection of the real property." Md.Code (1985, 2001 Repl.Vol.), § 8–103 of the Tax–Property Article.

3. Statutory references throughout are to the Tax–Property Article, Maryland Code (1985, 2001 Repl.Vol.), unless otherwise noted.

4. A "taxable year" under Section 1–101(ll) "means July 1 to June 30, both inclusive, for which the State, each county, municipal corporation,

value is applicable" or the "date of finality," which is the date that "assessments become final for the taxable year next following." Sections 1–101(i) and 8–104. Specific events, however, may occur during a three year cycle that may result in a "mid-cycle" revaluation of the property, although they are limited by Section 8–104(c) to the following:

(i) the zoning classification is changed at the initiative of the owner or anyone having an interest in the property;

(ii) a change in use or character occurs;

(iii) substantially completed improvements are made which add at least $50,000 in value to the property;

(iv) an error in calculation or measurement of the real property caused the value to be erroneous;

(v) a residential use assessment is terminated pursuant to § 8–226 of this title; or

(vi) a subdivision occurs.

The mid-cycle revaluation affects the value of the real property as of the original date of finality under 8–104(c)(2).[5]

In the case at bar, a mid-cycle revaluation was prompted by a sale of the property rather than any of the six statutory factors and so, we are presented with the question raised on certiorari by the Supervisor of Assessments for Montgomery County:

When the value of the subject property has increased by more than $50,000 because of substantially completed renovations in the previous calendar year, and this increase in

---

and taxing district of the State computes, imposes, and collects property tax."

5. Section 8–104(c)(2) provides:

(2) When real property is revalued under this subsection, the Department or supervisor shall:

(i) determine the value that would have resulted if the revaluation had occurred for the 1st year of the 3–year cycle;

(ii) determine the value that would have resulted if the revaluation had occurred for the 1st year of the preceding 3–year cycle; and

(iii) adjust the phased-in value for each of the years remaining in the 3–year cycle to reflect the change that results from the revaluation.

value is not captured in the existing assessment, is the § 8–104(c) mandate to revalue the property at a new, correct value negated when the Supervisor's review of the property was prompted by a recent sale or the assessor had some knowledge of the renovations at the time of the last triennial assessment?

## I.

In this case, the purchasers of Georgian Towers,[6] Stellar GT ("Stellar"), appealed a mid-cycle reassessment of the apartment building from $52,561,600 to $88,865,500, which would have resulted in a substantial tax increase. Stellar first appealed to the Property Tax Assessment Appeals Board, which ultimately affirmed, and then to the Maryland Tax Court. The Tax Court held a hearing on May 10, 2006, during which Thomas Borger, the President of Borger Management, the property and construction manager of Georgian Towers since 1988, testified that nearly 13 million dollars in renovations to the building took place between 1999 and 2003.[7] Borger also testified that in October of 2003 he met with David M. Gantz, an assessor of commercial property with the Montgomery County Office of the Maryland Department of Assessments and Taxation, who valued Georgian Towers in anticipation of the 2004 assessment notice, and tendered[8] a completed Income Questionnaire and a Construction Summary. The Income Questionnaire included income from rents, parking and retail stores as well as expenses from January 1, 2000 to December 31, 2002; there was no information provided for 2003. The Construction Summary listed all renova-

6. Georgian Towers is a high-rise apartment building located in Silver Spring.

7. Borger testified that 7 to 8 million dollars of the renovations were for deferred maintenance as opposed to improvements.

8. The record reflects that these documents were mailed by Borger Management and marked as "received" in the Montgomery County Office of the Maryland Department of Assessments and Taxation on October 16, 2003.

tions, including enhancements and deferred maintenance costs.[9] Borger further stated that Gantz had not "looked at the property in any detail"; in fact, the parties stipulated that "David M. Gantz also states that he did not inspect the subject property after the renovation information ... was presented to him by Thomas Borger in October of 2003." Borger testified that he had no further contact with the Assessment Office after he received the Notice of Assessment for $52,561,600 dated December 30, 2003.

In March of 2004, Borger testified, the property was sold to Stellar, the current owner of the property for approximately $89,000,000. Although Borger did not know of any change in the building's assessment until late in July 2004, the record does reflect that within three months of the sale, and only six months after the date of finality, on June 1, 2004, the Montgomery County Office of the Maryland Department of Assessments and Taxation sent a Notice of Assessment to Stellar to inform the company that Georgian Towers had been revalued from $52,561,600 to $88,865,500, an increase of $36,303,900. The Notice stated that "State law provides that in any year of a 3 year cycle, real property shall be revalued when certain factors cause a change in value. This is to notify you that the value of your property has been changed due to new construction for the full year." The Notice provided that the new phased-in market values, "for the next three taxable years," were as follows: $79,875,033 for 2004; $84,370,266 for 2005; and $88,865,500 for 2006.

Daniel Ercolani, the Supervisor of Assessments for Montgomery County Office of the Maryland Department of Assessments and Taxation at the time of the hearing, also testified, explaining that in the reassessment cycle, the actual work year for January 1, 2004 assessments was from January of 2003 to December of 2003 during which time "Assessors are going to be reviewing the permits, sending their Income Question-

---

9. Borger testified that as of October of 2003 all renovations were completed except for "final touches" to the smaller of the building's two lobbies.

naires to the owners, receiving the Income questionnaires, doing market studies of rents and cap rates and such." He further testified that in the instant case, Gantz used the income approach for the assessment of Georgian Towers, reflecting that he "took the number of units, the type of units, he put what he assumed were the accurate rents for each type of unit, he deducted a vacancy and expense, he capitalized it by a cap rate of 10.46, and that resulted in a valuation of [$52,561,600]." Ercolani also described the process of revaluing new construction and renovated properties:

> [I]n Montgomery County we have quarterly pickups. We are notified through the Montgomery County Permit Office of either additions or new construction. The permits are given to the Assessors in those areas. The Assessors make physical reviews of the properties, they determine what the values of what the new construction, what those values are, and notices are sent on a quarterly basis.

Ercolani acknowledged that he was statutorily prohibited from changing an assessment before the end of the three year cycle if the change was based upon a sale. Ercolani also acknowledged that the Montgomery County Permit Office notifies his office of additions and new construction on a quarterly basis and that he relied on that information to determine if a renovation had occurred that could have increased the value of a property by more than $50,000. According to him, were such a renovation to occur, the sales price of a building could then have been used to determine its value. Ercolani testified further that it was not until the March 2004 sale of Georgian Towers for approximately 89 million dollars that he realized that, "we had missed the valuation by such a large margin" and "asked the Assessors to go back out and to take another look to see if we had missed something." He related that two assessors, other than Gantz, then looked to whether any permits were on file and, after pulling the permits, a physical review of the building was conducted, both of which confirmed "that there had been [$50,000] spent in 2003." According to Ercolani, the building was then revalued based upon the sale price of $89,000,000 without taking into account the cost of the

renovations, relating further that "[t]he sale triggered it to come to my attention."

At the close of the evidence presented, the Maryland Tax Court, determined that the $88,865,500 reassessment was appropriate. The Tax Court's oral opinion [10] provided both findings of fact and conclusions of law:

> The property has been the subject of a renovation of at least Twelve to Thirteen Million Dollars since January 1—actually, since 1999. . . . [A]s of the beginning of '03, much of the renovation, although much of it was completed, there was a renovation of the East Lobby was—based on the documentary evidence as well as the testimony—was going to cost approximately Four Hundred and Fifty Thousand Dollars. And that apparently was performed predominantly in the calendar year 2003, although some may have been performed in '04, but that's not really consequential to the decision in this case.
>
> There is no dispute that the renovation of this particular property, the subject property, added at least Fifty Thousand Dollars in the value in the calendar year 2003. If there was a dispute, that's my finding as a matter of fact, that based upon the evidence that I've heard, that the renovation did, in fact, increase the value of the property at least Fifty Thousand Dollars during 2003.

> \* \* \*

> Now, in this particular case, there were some discussions between the Agent for the property owner, as well as Mr. Gantz—well known to the Court—an Assessor with Montgomery County for many, many years. And there were some discussions, there was some information passed on between the two regarding the renovations. But I'm not—I don't think that that has a particular impact on what the law is in this particular case. Mr. Gantz was trying to do his

---

**10.** The Tax Court delivered an oral opinion on the day of the hearing and soon after, on May 26, 2006, issued an order affirming the Property Tax Assessment Appeals Board.

job, and, and, as far as I could see, the Petitioner was trying to assist Mr. Gantz in doing his job. But Mr. Gantz, after reviewing the information, increased the value from, I think, Forty Million to approximately Fifty-two Million. But that is not what caused the real issue in this case.

What happened was, in March of '04, the property sold for approximately Eighty-nine Million Dollars, and that required the Supervisor and others with the Department of Assessments in Montgomery County to take a hard look to find out what happened, which, I think, is the right way to handle something like that. If you have a Fifty-two Million Dollar assessment as of January 1, '04, and the property sells for Eighty-nine Million, if I was in charge of the Department, I'd be asking some questions too. So I think that was an appropriate response.

And, after looking at it, it was very obvious that there had been over Fifty Thousand Dollars in renovation or increased value due to substantial renovations, which occurred over this time period. Well, there's little question that prior to '03—in '03 there were at least Fifty Thousand that increased the value at least Fifty-two Thousand and Fifty Thousand Dollars. And the reason that's important is based on the Code, Section 8-104(c): In any year of a three year cycle—I'm reading from the Code—a revaluation is required and, in fact, real property shall be revalued—key word, revalued—if any of the factors listed below cause a change in the value of the real property.

Of course, the pertinent section here is (c)(iii) where it states that substantially completed improvements are made, which add at least Fifty Thousand Dollars in value to the property.

\* \* \*

Under 8-104, the Department of Assessments, from my standpoint or of my interpretation of the statute, is mandated to do a mid-cycle review under this particular circumstance. And, as [the attorney for the Supervisor] has pointed out, I think it is a trigger. It is not a trigger just to

add the value of the improvements, it's a trigger to revalue the improvements. To merely add the value of the improvements would require the Assessor only to consider one of the approaches and not all three of the approaches because to do otherwise would basically minimize the market approach, as well as the income approach. And from my standpoint, it would seem reasonable that the sale in March of '04 had to be considered because that revaluation under 8–401 [11] requires that you have a different date of finality. You have a semi-annual date of finality, which would have been, I believe, July 1st, which means that everything—any new evidence which occurred prior to that date had to be considered by the Assessor in making their determination.

In essence, then, the Tax Court concluded that revaluation was permissible, regardless of what actually precipitated it, as long as one of the statutory bases for revaluation existed.

Stellar sought judicial review in the Circuit Court for Montgomery County, where the decision of the Tax Court was affirmed, and appealed to the Court of Special Appeals, which reversed. In a reported opinion, Judge Raymond G. Thieme, Jr., writing for the intermediate appellate court, held that the facts presented to the Tax Court "do not support the legal conclusions reached by the court," because "the Supervisor used the sale price of the property as a retroactive justification for a reassessment," and the sales price did "not fall within any of the enumerated exceptions to the statutory scheme," providing for reassessments every three years. *Stellar GT v. Supervisor of Assessments,* 178 Md.App. 624, 636, 943 A.2d 100, 107 (2008). He also noted that reliance on the three sources of data typically precipitating a revaluation based on substantially completed improvements, including a review of available building permits, a visual inspection by assessors or a review of owner submitted documents, was not supported by the record—the reassessment had not been

---

**11.** Although the transcript references Section 8–401 it is likely, based on the subject matter of the paragraph, that Section 8–104 was the intended reference.

based upon any data other than sales price. *Id.* at 634, 943 A.2d at 106. We granted certiorari, 405 Md. 290, 950 A.2d 828 (2008), and shall affirm the judgment of the Court of Special Appeals.

## II.

When reviewing an administrative decision from the Maryland Tax Court, we generally review that decision directly, not the decision of the circuit court on judicial review. *Comptroller of Treasury v. Science Applications Intern. Corp.*, 405 Md. 185, 192, 950 A.2d 766, 770 (2008). The decision of the Tax Court will be affirmed unless that decision is not supported by substantial evidence appearing in the record or is erroneous as a matter of law. *Comptroller of the Treasury v. Blanton,* 390 Md. 528, 535, 890 A.2d 279, 283 (2006); *State Dept. of Assessments and Taxation v. Consol. Coal Sales Co.,* 382 Md. 439, 454, 855 A.2d 1197, 1206 (2004). We have previously noted that "the interpretation of the tax law can be a mixed question of fact and law, the resolution of which requires agency expertise." *Comptroller of the Treasury v. Citicorp Intern. Communications, Inc.,* 389 Md. 156, 164, 884 A.2d 112, 116 (2005). The Tax Court's decision, however, will be overturned if it was based on an error of law. *Consol. Coal Sales Co.,* 382 Md. at 454, 855 A.2d at 1206, citing *Supervisor of Assessments v. Hartge Yacht Yard, Inc.,* 379 Md. 452, 461, 842 A.2d 732, 737 (2004).

The issue of whether the mid-cycle revaluation in the case at bar was proper under Section 8–104(c) is a question of statutory interpretation. In statutory interpretation, our primary goal is always "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules." *Barbre v. Pope,* 402 Md. 157, 172, 935 A.2d 699, 708 (2007); *Gen. Motors Corp. v. Seay,* 388 Md. 341, 352, 879 A.2d 1049, 1055 (2005). *See also Dep't of Health & Mental Hygiene v. Kelly,* 397 Md. 399, 419–20, 918 A.2d 470, 482 (2007). We begin our analysis by first looking to the normal,

plain meaning of the language of the statute, reading the statute as a whole to ensure that " 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.' " *Barbre,* 402 Md. at 172, 935 A.2d at 708; *Kelly,* 397 Md. at 420, 918 A.2d at 482. *See also Kane v. Bd. of Appeals of Prince George's County,* 390 Md. 145, 167, 887 A.2d 1060, 1073 (2005). If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions, and our analysis ends. *Barbre,* 402 Md. at 173, 935 A.2d at 709; *Kelly,* 397 Md. at 419, 918 A.2d at 482; *City of Frederick v. Pickett,* 392 Md. 411, 427, 897 A.2d 228, 237 (2006). If, however, the language is subject to more than one interpretation, or when the language is not clear when it is part of a larger statutory scheme, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute. *Barbre,* 402 Md. at 173, 935 A.2d at 709; *Kelly,* 397 Md. at 419–20, 918 A.2d at 482; *Smack v. Dep't of Health & Mental Hygiene,* 378 Md. 298, 305, 835 A.2d 1175, 1179 (2003).

The Supervisor argues that, upon learning of substantially completed improvements adding value to property, which have not been captured in an existing assessment, he must revalue the property, regardless of how he acquired that knowledge; he contends that Section 8–104 does not restrict the use of information concerning an increase in value even if the source of information differs from what is asserted to be the basis of the revaluation. The Supervisor also proffers that when there has been substantial completion of improvements that add $50,000 in value to a property, Section 8–401(f)(4) permits a revaluation during the next calendar year. Stellar, conversely, asserts that the Court of Special Appeals holding should be affirmed, because a sale after the date of finality is not one of the circumstances permitting revaluation under Section 8–104, whether or not one of the specified factors that could initiate the revaluation was uncovered.

Section 8–104 provides that "once in every 3–year cycle" real property should be valued to establish its value as of a date of finality, after which the value is phased in over the three year cycle; property may be revalued as of the date of finality if one of six factors, including "substantially completed improvements," "*causes* a change in the value of the property." (emphasis added). The word "cause" is unambiguous and dictates the result in this case. "Cause" is defined by Merriam–Webster's Collegiate Dictionary as "a reason for an action or condition" and "something that brings about an effect or result." 196 (11th ed.2005). *See also* Black's Law Dictionary 235 (8th ed.2004) (defining cause as "[t]o bring about or effect"). The basis for the revaluation clearly was the sales price, rather than a review of the premises, the documents available from the permit office or the documents submitted by the owner. The reassessment was mired in Ercolini's admissions in testimony that "the major guide in arriving at [the $88,865,500] figure was the sales price" and that he "did not take [the renovation costs] into account" in revaluing the property.[12] As noted by the Court of Special Appeals, Ercolini testified that he was not prompted to initiate the action of revaluation by the issuance of building permits, any review of the premises or documents submitted by the owner:

As to the first method, it was not until *after* Ercolani had decided that the sale price indicated that the regular assessment must have been erroneous that he asked to see the relevant building permits. As to the second, the assessor, Gantz, did not conduct a visual inspection of the renovation work. As to the third, the documents submitted to Gantz for his use in preparing the regularly scheduled assessment showed the work being performed on the lobby and listed its value as $ 425,000.

12. Although Ercolani testified on direct examination that the property was revalued based on the "the income approach using rents that [he] thought were more accurate for the time period," he subsequently admitted during cross-examination that the sale prices was the "major guide" in arriving at the $88,865,500 figure.

*Stellar GT,* 178 Md.App. at 634, 943 A.2d at 106. (emphasis in original).

Our conclusion that one of the factors specifically enumerated in Section 8–104(c) must bring about the revaluation and the change in value is supported by *Supervisor of Assessments of Baltimore City v. Chase Associates,* 306 Md. 568, 571, 510 A.2d 568, 569 (1986). In *Chase Associates,* we recognized that "the legislature chose not to provide generally that any change in value would precipitate mid-cycle reassessment, but rather to link reassessment to the occurrence of certain specified events ... likely to presage a change in value." *Id.* at 577, 510 A.2d at 572. In that case we denied the validity of a mid-cycle reassessment of a high-rise apartment building when the revaluation was instituted "solely in response to the establishment of a condominium regime on the property," just over 10 months after the date of finality. *Id.* at 571, 510 A.2d at 569. The Supervisor of Assessments of Baltimore City had "issued new, individual Notices of Assessment for each of the 246 condominium units," which reflected a value for each unit, causing the value of the building to increase from $3,603,700 to $14,175,350 when the aggregate value of each condominium was considered. *Id.* We first noted that Section 232(8)(d), the precursor to current Section 8–104, provided for revaluation only in limited circumstances including when "a substantial change occurs in the use of the property" and that Section 19(a)(1) provided that "land may be reassessed whenever it has been subdivided or the character or use is changed after the date of finality." *Id.* at 570–71, 510 A.2d at 569. In evaluating whether either of the statutory provisions allowed for a mid-cycle revaluation based on the conversion of the building to condominium units, we summarized the purpose of mid-cycle revaluations:

> The purpose underlying the mid-cycle reassessment procedure of § 232(8)(d) was clearly to improve the accuracy with which a property's assessed value reflects its current value throughout a triennial cycle. In implementing this purpose, however, *the legislature chose not to provide generally that any change in value would precipitate mid-cycle reassess-*

*ment, but rather to link reassessment to the occurrence of certain specified events, including a substantial change in use, likely to presage a change in value.* The legislature's reasons for drafting the statute in this manner may well have included lessening the tremendous administrative burden the more general provision would have created, and increasing the predictability and consistency with which the reassessment process would be invoked.

*Id.* at 577, 510 A.2d at 572. (emphasis added). We concluded that the filing of a condominium declaration was not a "subdivision" within the meaning of the statute. We reflected that were we to consider the conversion of the building to condominium units as a "change in use," we would, "disregard the legislature's deliberate choice of a specific rather than a general drafting style." *Id.* We further noted that, "[a]lthough a change in use may occasion or coincide with a change in value, the concepts are entirely distinct, and the Tax Court erred in equating them for purposes of § 232(8)(d)(2)." *Id.* at 578–79, 510 A.2d at 572–73.

In *Chase Associates,* 306 Md. at 577, 510 A.2d at 572, we equated "cause" in the statute with "linkage," rather than "trigger" as the Tax Court opined in the present case. Linking reassessment to the occurrence of certain specified events, as defining causation, differs from the Supervisor's and the Tax Court's concept of causation; both would obviate any direct linkage between the change in value and its cause and rely only on the proffered existence of one of the statutory factors, even if the revaluation was not based upon that statutory factor.

■ The Supervisor must assert that linkage exists between substantially completed improvements and the new value in the present case, because we have heretofore held that a sale cannot be linked to a mid-cycle revaluation. *Montgomery County Board of Realtors, Inc. v. Montgomery County,* 287 Md. 101, 103, 411 A.2d 97, 98 (1980). In *Montgomery County Board of Realtors,* the County Council enacted a ordinance entitled "Real Property Tax Recapture," which im-

posed "upon the transfer of real property located in Montgomery County a tax on the amount by which the taxable value of such property on the date of recognition [13] exceeds the assessed valuation of that property." *Id.* We determined that Montgomery County's attempt to "reassess and tax real property after the date of finality" was in direct conflict with the statutory provisions relating to the date of finality,[14] concluding that "its effect is to move forward the date of finality as to sales made after that date." *Id.* at 109–110, 411 A.2d at 101–02. We emphasized:

> On the basis of an actual sale subsequent to the date of finality the County seeks to second guess the State's expert appraisers in the office of the Montgomery County Supervisor of Assessments and thus to make a retroactive reassessment. As a matter of fact, a sale during the year at a price in excess of the value placed on the property at the time of assessment does not necessarily indicate erroneous valuation. First of all, we have commented on several occasions that valuation of land is not an exact science and that experts will often differ as to their opinion of fair market value. Secondly, although assessments are as of the date of finality, the valuation upon which the assessment is based is necessarily made some time in advance of that date. A number of factors could occur even between the date of finality and the date of ultimate sale which would alter property values. An example of a reverse change in such

---

13. The "date of recognition" was defined as "the date on which the transfer of real property takes place." *Montgomery County Board of Realtors, Inc. v. Montgomery County*, 287 Md. 101, 103, 411 A.2d 97, 98 (1980).

14. At the time of Montgomery County Board of Realtors, the property tax laws were codified in Article 81 of the Maryland Code and property could be revalued under Section 232 of Article 81 of the Maryland Code (1957, 1980 Repl.Vol.) in any year that any one of the following occurred:

   (1) The zoning classification of the property is changed;
   (2) A substantial change occurs in the use of the property;
   (3) Extensive improvements are made to the existing property;
   (4) The previous assessment was clearly erroneous due to an error in calculation or measurement of the improvements on the property.

values is the current report in the public press that real estate values have dropped substantially in recent months as a result of high mortgage interest rates.

*Id.* at 110, 411 A.2d at 102. (citations omitted). Therefore, to avoid the epithet of retroactive reassessment, a revaluation must not be linked to a sale, but to one of the statutory factors, which admittedly did not cause the revaluation in the present case.

The Supervisor attempts to distinguish *Montgomery County Board of Realtors,* asserting that we were concerned in that case with not only the retroactive reassessment but also the fact that the effect was to "impose a property tax in past years on the value that was in excess of the assessment in the previous year." He proffers that in the present case, however, "the property's valuation has been brought to its current value based upon the triggering event, but it will only be taxed upon that value on a prospective basis." He further specifies:

In this case, a notice of an increase in value was issued in June 2004, which was within the calendar year after the completion of the renovations that caused the $50,000 increase in value. *That notice reflected a new value as of the original date of finality, January 1, 2004,* of $88,865,600, which was phased in for the tax year commencing on July 1, 2004 with a taxable assessment of $79,875,033.

(Emphasis added). The Supervisor errs in his distinction, however, because in this case and in *Montgomery County Board of Realtors,* we were concerned primarily with the retroactive effect of the increase in value of the properties as of the date of finality, rather than when the newly computed tax would be imposed. When the tax is imposed, therefore, is not before us. The retroactive nature of an assessment caused by a factor not set forth in Section 8–104 is the issue at hand.

■ The Supervisor, however, asserts that Section 8–401 enables him to revalue the property during the next calendar year, or in this case during 2004, no matter what precipitated

the revaluation. At the time of the events herein, Section 8–401 stated: [15]

(a) *Notice in writing.*—When any change as provided in subsection (b) of this section occurs in the value or classification of any real property that a supervisor assesses, the supervisor shall notify the owner or other appropriate person by a written notice of the proposed change.

(b) *Instances requiring notice.*—A written notice is required for:

(1) an increase or decrease in an existing real property value;

(2) a change in the classification of the real property;

(3) establishment of an initial real property value;

(4) a decision on an assessment appeal or a petition to change an existing real property value or classification; and

(5) a revaluation or reclassification, if a valuation or classification has been appealed but not finally determined.

(c) *Information on notice.*—The notice for subsection (b)(1) of this section shall include:

(1) the amount of the current value;

(2) the amount of the proposed value including a statement that the total amount of the proposed value is the value for purposes of appeal;

(3) the amount of the proposed value that will be the basis for the assessment in each year of the 3–year cycle;

(4) a statement:

(i) indicating the right to appeal; and

(ii) briefly describing the appeal process and the property owner's bill of rights; and

(5) a statement that valuation records are available as provided by § 14–201 of this article.

---

**15.** Section 8–401 was amended by Chapter 699 of the Acts of 2008, which inserted "current triennial cycle or the" and "whichever is earlier" in (f)(2) through (f)(4); "or character" was inserted in (f)(3).

(d) *Additional information required in notice.*—In the instance of notices required in subsection (b)(2), (3), (4), and (5) of this section, the notice shall include:

(1) the amount of the current value;

(2) the amount of the proposed or final value;

(3) the amount of the proposed value that is the basis for the assessment in the applicable years of the 3–year cycle;

(4) a statement:

(i) indicating the right of appeal; and

(ii) briefly describing the appeal process and the property owner's bill of rights; and

(5) a statement that valuation records are available as provided by § 14–201 of this article.

(e) *Service of notice.*—The notice shall be served as provided by § 8–402 of this subtitle on or before January 1 or any other date specified in this article.

(f) *Effect of failure to send notice.*—A failure to send a notice of any change in value or classification within 30 days after the date provided in subsection (e) of this section creates an irrebuttable presumption that in the instances specified in subsection (b)(1) through (4) of this section that the prior value has not changed unless:

(1) the property has been transferred for consideration to new ownership during the previous calendar year;

(2) the zoning classification of the property changed during the current triennial cycle or the previous calendar year, whichever is earlier, resulting in an increased value of the property;

(3) a substantial change occurred in the use or character of the property during the current triennial cycle or the previous calendar year, whichever is earlier;

(4) extensive improvements have been made on the property during the current triennial cycle or the previous calendar year, whichever is earlier, as provided in § 8–104(c)(1)(iii) of this title;

(5) due to an error in calculating or measuring improvements on the property the assessment for the previous taxable year was clearly erroneous; or

(6) the assessment has been decreased.

Section 8–401, thus, pertains to the "[e]ffect of failure to send notice" within 30 days of the date of finality or other pertinent date and "creates an irrebuttable presumption that … the prior value has not changed" absent certain factors, including when "extensive improvements have been made on the property during the previous calendar year as provided in § 8–104(c)(1)(iii) of this title." Therefore, unlike what the Supervisor asserts, Section 8–401 is dependent on Section 8–104 for the permissible factors for reassessment and does not enable revaluation for any factor other than those statutorily specified.

Because we conclude that the revaluation of Georgian Towers for $88,865,500 was "caused" by its sale for $89,000,000, amounting to a retroactive reassessment, we shall affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

Dissenting Opinion by MURPHY, J., which RAKER, J., Joins.

I agree with the Maryland Tax Court and the Circuit Court that (in the words of petitioner's brief) (1) "the fact that a property was recently revalued under the normal in-cycle assessment process under [§ 8–104(b) ] does not remove the property from the mandate of [§ 8–104(c) ]," and (2) "once the renovations of the subject property were completed, the only issue was whether the existing assessment included the value associated with those renovations, not how the property came to the attention of the assessment office nor the extent of its knowledge of those renovations at the time of the previous assessment." For those reasons, in light of the Tax Court's non-clearly erroneous factual finding "that the renovation of

... the subject property[ ] added at least Fifty Thousand Dollars in the value in the calendar year 2003[,]" I would affirm the judgment of the circuit court.

Judge RAKER has authorized me to state that she joins in this dissenting opinion.